# NORTHERN STATES POWER COMPANY v. CITY OF ST. PAUL AND OTHERS.
## DAN GEPHART, INTERVENOR.

99 N. W. (2d) 207.

November 6, 1959—Nos. 37,713, 37,722.

*Louis P. Sheahan,* Corporation Counsel, and *Robert E. O'Connell,* Assistant Corporation Counsel, for appellants.

*Robins, Davis & Lyons* and *Willard L. Converse,* for intervenor.

*Donald E. Nelson, A. R. Renquist,* and *Cummins, Cummins, Hammond & Ames,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order of the trial court granting plaintiff's petition for an interlocutory injunction restraining defendants from enforcing existing gas rates during the pendency of the action. Other provisions of the injunction will be discussed more fully hereinafter.

Plaintiff, Northern States Power Company, referred to hereinafter as the company, is a corporation organized under the laws of Minnesota and is engaged as a public utility in the distribution of gas, among other things, to consumers in the city of St. Paul and elsewhere. The company purchases its natural gas for resale from Northern Natural Gas Company, which owns and operates a pipeline extending from the natural gas fields to the city of St. Paul and to other places where it sells its gas for distribution. The company purchases gas under rates fixed and determined by the Federal Power Commission under the Natural Gas Act, 15 USCA, § 717, of Congress.

Defendants are the city of St. Paul and its mayor and councilmen. The city of St. Paul is a city of the first class operating under a home rule charter.

Authority to fix gas rates in cities of the first class, which includes the city of St. Paul, is delegated by the legislature to the governing body of the city under and by virtue of L. 1935, c. 286. Pursuant to that authority the city council adopted Ordinance No. 9313 on June 24, 1949, under which, among other things, rates for retail distribution and sale of gas were established. Ordinance No. 9313 was amended on August 31, 1955, by Ordinance No. 10632, under which amendment a new schedule of rates was established. On November 30, 1956, Ordinance No. 9313 was again amended by Ordinance No. 10870. The company continued to operate under the rates established by Ordinance No. 10870 until August 27, 1957. On that date Northern Natural Gas Company increased its charges for gas purchased by the company. This increased cost of gas purchased by the company, based on sales in St. Paul for the year 1957, would amount to approximately $600,000. To offset this increased cost to it, the company petitioned the city for an increase in the rates it might charge its consumers over and above the rates established by Ordinance No. 10870. The petition was denied by the city on the ground that it was then premature. In May 1958, after the objection of prematurity no longer existed, the company renewed its petition for the same rates as had been requested in the August 1957 petition. The increased rates thereby sought by the company were intended to cover only the amount occasioned by the increased cost of gas to it. It did not include any increased cost of labor, material, or other items of that nature. The petition was referred to the City Council Utilities Commission for study by it and its utilities engineer. The commission and the engineer recommended that it be granted. The council then directed its corporation counsel to draft an ordinance incorporating the new rates, which was done. The proposed ordinance was read on three separate occasions, as is required by the city charter. No objection was voiced to it until the third reading, when intervenor objected. It was then rereferred to the utilities commission, and thereafter, by a divided vote of the council, the petition was denied.

The company then commenced this action for injunctive relief. The trial court granted an interlocutory injunction restraining defendants from enforcing existing rates or from interfering with the collection

of rates proposed by the company in its petition until the city would establish reasonable rates. The company was also permitted to raise these rates if further increases in cost of gas to it occurred in the future. In order to protect the consumers of the city, the company was required to post a bond in the sum of $600,000 conditioned upon repayment to the consumers of any amount collected in excess of existing rates if it were ultimately found that such rates were reasonable. The company was also required to agree to return to consumers any rebate received by it from Northern Natural Gas Company if that company should be required to make such rebate.

The appeal is from the temporary injunction so granted by the court.

The questions presented here are: (1) May the court grant a temporary injunction restraining the city from enforcing its ordinance establishing rates or from interfering with the utility charging rates which it contends are reasonable pendente lite? (2) Was there an abuse of discretion by the trial court in granting the temporary injunction based on the evidence in this case?

■ Essentially, it is the contention of the city and intervenor that the ratemaking power involves the exercise of a legislative function which may not be usurped by the court; that the injunction in this case in effect establishes rates which the company may charge contrary to the rates established by the city; hence, that the court has usurped the legislative function which rests exclusively with the city.

We think that this contention of the city is based upon a misconception of the nature of the injunctive relief granted by the court. The authority of the city to fix rates is delegated to it by the legislature under L. 1935, c. 286, the pertinent portion of which reads:

"* * * the governing body of any such city [that is, city of the first class] is hereby authorized and empowered, notwithstanding anything to the contrary in the home-rule charter of such city, by ordinance, to permit such public service corporation to use the streets and other public property located in such city, and to prescribe from time to time, but not more often than once in each calendar year, reasonable rates which any such public service corporation may charge for such service within such city, and to determine the amount which

any such public service corporation shall pay the said city for the use and occupancy of its streets or other public property which are located in and under the control of any such city and used by such corporation."

Pursuant to that authority, the city adopted its Ordinance No. 9313. The pertinent portion of § 4 thereof reads:

"'* * * The Council may, upon its own initiative, or shall, upon petition of the Company, but not more often than once each year, review the operations of the Company under this permit and after a public hearing, of which ten days published notice shall be given, prescribe by resolution, reasonable rates which it may charge for gas service."

Section 5 reads:

"Should the Company's operating expenses, including particularly the cost of natural gas to the Company, increase over and above the normal increase due to the growth of business, through causes beyond its control, said Company, in view of the then changed conditions, will be entitled to a revision of its rates to offset such increases, but the application of such revised rates shall not produce in excess of a reasonable return to such Company and shall be subject to reasonable regulation by the Council."

We have often held that prescribing or fixing rates for a public utility involves a legislative function which may not be usurped by the courts.[1]

It is equally well settled that some form of judicial review of the reasonableness of rates fixed by the ratemaking body is an essential requirement in the exercise of due process.[2]

In Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 458, 10 S. Ct. 462, 467, 33 L. ed. 970, 981, the United States Supreme Court said:

---

[1]City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10; In re Applications to Fix Streetcar Rates of Fare, 228 Minn. 435, 37 N. W. (2d) 533.

[2]City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10; State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294.

"* * * The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

Just where the legislative function involving the power to fix rates ends and the judicial function involving a review of the reasonableness of such rates begins is not always easy to determine. It is clear, however, that while the courts may not usurp the legislative function of rate-making neither are they impotent to grant relief from confiscatory or noncompensatory rates established by the ratemaking authority. Courts must and do have the power to prevent the unlawful taking of property without due process of law by the establishment of rates which are confiscatory or noncompensatory. The statute involved in this proceeding (L. 1935, c. 286) provides for no appeal from the decision of the city. Aside from injunctive relief restraining the city from enforcing confiscatory rates, the utility has no adequate remedy.

In St. Paul Book & Stationery Co. v. St. Paul Gaslight Co. 130 Minn. 71, 153 N. W. 262, we held that a consumer could not obtain injunctive relief against a rate claimed to be too high if it was within the permissible limits of the law. However, with respect to the right of a utility to obtain injunctive relief from a confiscatory rate, we said (130 Minn. 74, 153 N. W. 264):

"* * * It is well settled now that a public service corporation may seek and obtain the aid of the court enjoining the enforcement of un-reasonably low rates, no matter by what authority established. Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. ed. 970."

Denial of an application for increased rates, where existing conditions require it, has the same effect as fixing unreasonably low rates.[3]

Prendergast v. New York Tel. Co. 262 U. S. 43, 43 S. Ct. 466, 67 L. ed. 853, involved an appeal from an order of the Federal district court enjoining pendente lite the enforcement of orders of the Public Service Commission of New York prescribing maximum rates for the exchange service of defendant telephone company. With respect to the power of the court to grant a temporary injunction pending a hearing on an application for establishment of reasonable rates, the court said (262 U. S. 49, 43 S. Ct. 469, 67 L. ed. 858):

"* * * Upon a showing that such reduced rates were confiscatory the Company was entitled to have their enforcement enjoined pending the continuance and completion of the rate-making process. * * *

"The application for the injunction was heard by the District Court upon the pleadings and affidavits relating to the cost and value of the Company's property, its revenue and expenses. It was not necessary that the Company offer in evidence the voluminous testimony that had been taken by the Commission on the legislative question prior to making the orders in question. * * *

"* * * It is well settled that the granting of a temporary injunction, pending final hearing, is within the sound discretion of the trial court; and that, upon appeal, an order granting such an injunction will not be disturbed unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion. * * * Especially will the granting of the temporary writ be upheld, when the balance of injury as between the parties favors its issue. * * * Here the Commission had prescribed temporary rates which were found to be confiscatory, which were to continue in effect pending the final determination of the Commission after its investigation had been completed; * * *. The Company * * * could only be protected from loss by injunction; while, on the other hand, its subscribers were protected by the bond which was required for the return of the excess charges collected if the injunction should be thereafter dissolved."

---

[3] In re Application to Fix Streetcar Rates of Fare, 235 Minn. 226, 50 N. W. (2d) 483.

The injunction does not purport to establish a rate but simply preserves the status quo of the parties until the case is finally determined on its merits or until the ratemaking body proceeds to fix a rate that is compensatory. It operates to prevent an unconstitutional confiscation of property. It is generally held that where the body entrusted with ratemaking power fails or refuses to act in establishing reasonable rates a utility may be permitted to charge rates fixed by it until a reasonable rate is established.[4]

The granting or denial of a temporary injunction involves a balancing of the harm which will result to the parties involved if the injunction is granted or denied. In this case, the consumer is protected by a bond conditioned upon repayment to it of charges collected in excess of those established under Ordinance No. 10870 if it is ultimately determined that such rates are reasonable. On the other hand, if the injunction were to be denied, the company would have no way of recouping its losses if it is finally determined that established rates were unreasonable or confiscatory. Under the showing made to the trial court, the equities clearly are in favor of the company, and it would seem that no appreciable harm can result to the consumer inasmuch as he is fully protected by the injunction.[5]

Delegation by the legislature to the city of legislative power to establish rates carries with it the correlative obligation of exercising that power in a reasonable manner. When the city fails or refuses to perform its delegated function, a court of equity may protect the property of a utility from confiscation by enjoining the city from enforcing existing rates. The exercise of such equity powers is not a usurpation of the legislative function to fix rates. The city may proceed at any time it sees fit to fix reasonable rates, as its ordinance in plain terms re-

---

[4]Cf. City of Hutchinson v. Hutchinson Gas Co. 125 Kan. 346, 264 P. 68, 57 A. L. R. 137; Southern Bell T. & T. Co. v. Georgia Public Service Comm. 203 Ga. 832, 49 S. E. (2d) 38; Arizona Corp. Comm. v. Mountain States T. & T. Co. 71 Ariz. 404, 228 P. (2d) 749; Northwestern Bell Tel. Co. v. Spillman (D. Neb.) 6 F. (2d) 663.

[5]See, Prendergast v. New York Tel. Co. 262 U. S. 43, 43 S. Ct. 466, 67 L. ed. 853.

quires it to do. As long as it refuses or fails to act, a court of equity has ample power to protect the rights of the utility affected.

■ The city next contends that there was an abuse of judicial discretion in granting the temporary injunction on the showing made in this case. The application was based on the verified complaint and the affidavit submitted in support thereof. Affidavits were submitted in opposition to the granting of the injunction by the city. The court found the facts substantially as stated above. The verified complaint and attached affidavit, if accepted as true, support such findings. The final determination of the issues raised must await a trial of the action. A prima facie showing was made that the company would suffer irreparable damage unless the injunction was issued. On the other hand, the rights of the consumers are adequately protected. If we assume that the rates established under Ordinance No. 10870 were reasonable prior to the increase in the cost of gas to the company, it must follow that such rates became inadequate to the extent of the increase which the company is compelled to absorb unless other savings were made to offset such increase. Under § 5 of Ordinance No. 9313, it would appear that the company is entitled to relief. It follows that a prima facie showing was made which would justify the issuance of the injunction. We find no abuse of judicial discretion.

■ The city then contends that the court used the wrong rate base in determining whether rates established under Ordinance No. 10870 were reasonable. Whether the original cost, reproduction cost, or fair value should be used as a rate base we need not now determine. The court found that no matter what base was used the rate was unreasonable and confiscatory. This finding is sufficiently sustained by the evidence to justify affirmance of a temporary injunction pendente lite.[6] It will be time enough to determine what is the proper rate base when the case is presented on the merits.

■ Intervenor presents many of the same propositions as we have discussed above. Further comment thereon is unnecessary. In addition, he contends that the company is estopped from questioning the rea-

---

[6]See, St. Paul City Ry. Co. v. City of St. Paul, 242 Minn. 188, 64 N. W. (2d) 487.

sonableness of rates established under Ordinance No. 10870 because of § 7 of the master ordinance, No. 9313, which reads:

"Unless said grantee questions by proper judicial proceeding any order or regulation prescribed for it by the Council within sixty (60) days after the resolution or ordinance prescribing such regulation or order shall become effective, said grantee shall be forever estopped from questioning the terms and liabilities of said order or direction. It shall be the duty of the City Clerk to promptly deliver to the grantee a copy of each ordinance or resolution affecting the grantee, adopted by the City Council."

Intervenor overlooks § 5 of the same ordinance which is set forth above. Obviously, § 7 can have no application to an increase in rates to which the company becomes entitled under the provisions of § 5. If that were not true, a rate once established could never be questioned by the company after a lapse of 60 days from the establishment thereof. To so hold would render § 5 meaningless. The whole ordinance must be read together, and each part thereof given meaning if that can be done.

■ The city, in one of its affidavits in opposition to the granting of an injunction, seems to rely in part on the fact that the overall operations of plaintiff would permit the company to absorb the increased cost of gas distributed to consumers in St. Paul. In addition to distributing gas in St. Paul, the company is engaged in an extensive electric distribution business and also distributes gas elsewhere. All that need be said about this contention is that the St. Paul consumers are not entitled to have the cost of gas to them subsidized by income received from other segments of the company's business. To do so would be to load onto the users of gas outside the limits of St. Paul and those who purchase electricity from the company a charge which would be unreasonable.[7]

Where, as here, the utility serves multiple municipalities, it has frequently been held that the property devoted to a particular municipality

---

[7]Iowa-Illinois Gas & Elec. Co. v. City of Fort Dodge, 248 Iowa 1201, 85 N. W. (2d) 28.

or territory may be taken as a separate unit for ratemaking purposes.[8] Where separate municipalities have the ratemaking power only within the limits of the municipality, it becomes essential that the property devoted to furnishing service therein be considered a separate unit for the purpose of establishing rates within that municipality. The same rule applies as in a case where the utility business is partly intrastate and partly interstate. In such cases the state agency has the power of fixing the rates for the business done within the state and the Federal agency has the power of fixing rates for interstate business.[9]

In The Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 435, 33 S. Ct. 729, 755, 57 L. ed. 1511, 1556, 48 L.R.A. (N.S.) 1151, 1182, Ann. Cas. 1916A, 18, 42, the court said:

"Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the State for intrastate transportation affords a fair return, must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. * * * The reason * * * is that the State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.

---

[8]43 Am. Jur., Public Utilities and Services, § 109; Wabash Valley Elec. Co. v. Young, 287 U. S. 488, 53 S. Ct. 234, 77 L. ed. 447; Columbus Gas & Fuel Co. v. Public Utilities Comm. 292 U. S. 398, 54 S. Ct. 763, 78 L. ed. 1327, 91 A. L. R. 1403.

[9]See, City of Houston v. Southwestern Bell Tel. Co. 259 U. S. 318, 42 S. Ct. 486, 66 L. ed. 961; Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255.