232 N.W.2d 854 (1975)
The STATE of South Dakota upon the relation of SOUTH DAKOTA ELECTRIC CONSUMERS, Plaintiff and Respondent,
v.
NORTHWESTERN PUBLIC SERVICE COMPANY, Defendant and Appellant.
Nos. 11458, 11481.
Supreme Court of South Dakota.
September 12, 1975.
Rehearing Denied October 27, 1975.
*855 John B. Wehde, Benson, Beach, Fingerson, Wehde & Martin, Huron, James E. Doyle, Doyle, Bierle & Hagerty, Yankton, for defendant and appellant.
James T. Goetz, Goetz, Hirsch, Haar & Blackburn, Yankton, for plaintiff and respondent.
WOLLMAN, Justice.
These two cases involve appeals by Northwestern Public Service Company from judgments entered by the circuit court in the nature of writs of mandamus ordering the company to provide electrical service at rates not exceeding those that were being charged by the company prior to the dates on which the company attempted unilaterally to raise the rates.[1]
Northwestern Public Service Company (the company) is an electric utility that sells electrical power at retail to some 108 municipalities in South Dakota. On or about June 1, 1973, the company gave notice to the governing bodies of the municipalities it serves that on July 1, 1973, an increase in its rates, amounting to some fifteen percent, would go into effect. In so giving notice of its intention to raise its rates, the company was following a long-standing practice of unilaterally raising or lowering its rates without interference by the governing bodies of the municipalities involved herein. The last rate adjustment had been put into effect in 1969.
The governing bodies of six of these municipalities, namely, the cities of Yankton, Mitchell, Chamberlain, Huron, Webster and Redfield (the cities) formed a consortium known as South Dakota Electric Consumers, plaintiff in this action, for the purpose of exercising a concerted action to adopt ordinances to implement their statutory authority to regulate electric rates.
*856 Because of the then existing Presidential price freeze, the company was unable to put its increased rate schedule into effect until August 13, 1973. On or before that date, the company commenced separate actions against the cities of Yankton, Chamberlain, Mitchell and Huron, seeking to have those municipalities enjoined from taking any action that would preclude the company's new rates from going into effect. These actions were subsequently dismissed upon the motion of the several municipalities involved, the latest of these dismissals occurring on or about October 17, 1973.
After those actions were dismissed, the cities proceeded to adopt "vehicle" ordinances in October and November of 1973 that apparently specified what type of data the company would be required to furnish the cities prior to a hearing to be held later for the purpose of determining the amount, if any, of the rate increase that the company would be entitled to impose.
On December 31, 1973, the circuit court issued an alternative writ of mandamus, based upon the application of the cities, ordering the company to furnish electrical service to the cities at rates not exceeding those fixed and determined in the year 1969 until such time as the cities fixed and determined any other rates. Subsequent to a hearing on the alternative writ of mandamus, the circuit court on March 25, 1974, entered a judgment issuing a peremptory writ of mandamus requiring the company to provide electrical service pursuant to its franchise ordinances within the cities at a rate not exceeding that rate fixed and determined in the year 1969, and until the cities should fix and determine any other rate of compensation, and further requiring the company to refund to its customer consumers in the cities all charges for electrical service made from and after August 1, 1973, that were in excess of those charged at the rates which were in existence on June 1, 1973, together with interest on said refunds.
The circuit court stayed execution of the judgment pending further proceedings in this court upon the filing of a bond in the amount of $400,000.00 by the company. We continued this stay of execution on the same terms and conditions and in the same amount of the bond.
The cities conducted a hearing on March 18-20, 1974, on the company's proposed fifteen percent rate increase. Following the hearing, the cities adopted ordinances on May 1-3, 1974, authorizing the company to increase its rates approximately 8.5 percent above those being charged on June 1, 1973.
By letter dated March 29, 1974, the company notified the governing bodies of the cities that it was filing new electric rates in all of the communities it served with electricity. These new rates, which were to become effective on May 1, 1974, were approximately thirteen percent higher than the rates that were then being charged by the company, which included the fifteen percent rate increase that the company had been charging since August 13, 1973.
On April 25 and 26, 1974, the cities adopted resolutions to the effect that the cities would move with all deliberate speed and dispatch to consider the thirteen percent rate adjustment requested by the company and that the cities would within a reasonable time adopt an ordinance detailing procedures and requirements for all rate adjustments, including the thirteen percent rate increase and all future requests for rate increases. The resolution also notified the company that it was without legal authority to impose the thirteen percent rate adjustment or any rate adjustment without authorization by the cities and that such authorization was being withheld for the thirteen percent adjustment. Finally, the resolution directed the company neither to bill nor to collect any portion of the thirteen percent rate adjustment until authorized to do so by the cities.
On April 26, 1974, the circuit court issued an alternative writ of mandamus, based upon an application made by the cities, requiring the company to render electrical *857 service pursuant to its franchise ordinances within the cities at the rate most recently determined by the cities and until the cities should fix and determine any other rate. Subsequent to a hearing on the alternative writ, the court entered judgment issuing a peremptory writ of mandamus ordering the company to render electrical service pursuant to its franchise ordinances within the cities for a rate not exceeding that rate fixed and determined by those ordinances adopted by the cities during the period from May 1 to May 3, 1974, and until the cities should fix and determine any other rate or compensation. The company's request for a stay of execution of this judgment and writ was denied by the circuit court and later by this court.
Although the company concedes for the purpose of these cases that the cities had authority pursuant to SDCL 9-35-1 to fix and determine the price of electricity, the company contends that because the cities had not provided any means whereby the company could apply for a rate increase it had the authority and the duty to unilaterally impose rate increases in order to insure the financial integrity of the company and thereby guarantee its ability to continue to provide electrical service to the cities.
Under the provisions of SDCL 9-35-1, every municipality has power "* * * to regulate the sale and use of gas and electric light and power; to fix and determine the price of gas and electric light and power and the rent of gas and electric meters * * *".[2]
There is authority for the proposition that in the absence of action by a regulatory body to exercise its authority to fix rates, a utility may fix its own rates, subject to the test of reasonableness. For example, in the case of City of Houston v. Memorial Bend Utility Company, Tex.Civ. App., 331 S.W.2d 418, the court stated that:
"* * * We take it to be established law that until such time as a regulatory body assumes to exercise its authority to fix rates which a utility may charge, that the utility may fix its own rates, provided they are reasonable. * * * Such rates would be binding until such time as the regulatory body assumes to exercise its authority." 331 S.W.2d 418, 421.
This rule was reaffirmed in Harris County Water Control and Improvement District v. City of Houston, Tex.Civ.App., 357 S.W.2d 789. In the case of Northern States Power Co. v. City of St. Paul, 256 Minn. 489, 99 N.W.2d 207, the court stated that:
"* * * It is generally held that where the body entrusted with ratemaking power fails or refuses to act in establishing reasonable rates a utility may be permitted to charge rates fixed by it until a reasonable rate is established." 99 N.W.2d 207, 212. (footnote omitted)
See generally 64 Am.Jur.2d, Public Utilities, § 133, p. 658; 29 C.J.S. Electricity § 33, p. 1031; 73 C.J.S. Public Utilities § 15, p. 1009.
The company argues that because the cities had completely abdicated their responsibility to exercise the rate making authority conferred by SDCL 9-35-1 in that they had adopted no procedure by which the company could apply for a rate increase, the company perforce was required to unilaterally submit and put into effect the fifteen percent rate increase to meet the spiraling costs of fuel and equipment that it faced in the spring and summer of 1973. In reply, the cities contend that as soon as they learned of the proposed rate increase they took prompt action to adopt ordinances that would provide for a hearing on the proposed increase but were frustrated in their efforts to do so by the legal actions brought by the company in August of 1973. The company and the cities agree that the company is *858 entitled to a reasonable rate of return on its investment and that the company is entitled to a hearing at which it can submit evidence to justify its proposed rate increase. Cf. Application of Northwestern Bell Telephone Co., 69 S.D. 36, 6 N.W.2d 165. The question, then, is whether in the absence of an existing procedure by which the company could have applied for a rate increase on June 1, 1973, the company was entitled to rely upon the general rule that in the absence of the assertion by a regulatory body of its authority to regulate utility rates a utility is entitled to fix its own rates.
Given the circumstances that faced the company in June of 1973, we conclude that the company was legally justified in unilaterally putting into effect the fifteen percent rate increase on August 13, 1973. The record reveals that the company was faced with marked increases in the cost of fuel, labor and supplies. There existed no established procedure whereby the company could have submitted information to the cities regarding its proposed rate increase and requested a hearing thereon. Indeed, there was no indication that the cities desired such information in view of the fact that in years past the company had unilaterally raised and lowered its rates without any official action being taken by the cities on such rate adjustments.
To hold that the company was legally authorized to unilaterally raise its rates in the summer of 1973 does not dispose of the question whether such increase was reasonable. The fixing of public utility rates is a legislative function, subject only to judicial review on the question of reasonableness. As was stated by the Minnesota Supreme Court in Northern States Power Co. v. City of St. Paul, supra:
"We have often held that prescribing or fixing rates for a public utility involves a legislative function which may not be usurped by the courts.
"It is equally well settled that some form of judicial review of the reasonableness of rates fixed by the ratemaking body is an essential requirement in the exercise of due process." 99 N.W.2d 207, 211. (footnotes omitted)
See 64 Am.Jur.2d, Public Utilities, §§ 126-132, pp. 651-58; 29 C.J.S. Electricity § 30, p. 1017. We do not reach the question of the reasonableness of the fifteen percent rate increase in this appeal. From the record before us it would appear that the question of the reasonableness of that rate increase was considered at the March 1974 hearing and was resolved adversely to the company. We were advised at oral argument that the company has appealed to the circuit court the determination by the cities that the company should be allowed only 8.5 percent of the requested fifteen percent rate increase. Whether this determination by the cities was so unreasonable as to amount to a confiscation or deprivation of the company's property is a question that must be resolved by the circuit court in the first instance.
In summary, we hold that although the company was entitled to unilaterally raise its rates by fifteen percent on August 13, 1973, said increase was effective only until such time as the cities determined, following the hearing held in March of 1974, that the fifteen percent increase should be reduced to the level set forth in the ordinances adopted in early May of 1974.
We turn then to the matter of the second rate increase. It is the company's contention that because the vehicle ordinances adopted by the cities in October and November of 1973 related only to the fifteen percent rate increase that had gone into effect on August 13, 1973, there existed no procedure by which the company could have applied for a subsequent rate increase and been granted a hearing thereon. Technically, the company's argument may very well be correct.[3] The president of the company *859 testified, however, that he was aware in June of 1973 that based upon the company's five-year forecast it would be necessary to impose another rate increase, although at that time he did not know the amount of the increase or the exact time when it would be placed in effect. Again, the president testified that at the time the company's 1974 budget was being prepared in late December of 1973 he knew that it would be necessary to put another rate increase into effect. Thus the company was aware as early as June of 1973 that it would need a subsequent rate increase. It was certainly aware by December 1973 that the cities had taken action to assert their statutory authority to regulate electric rates. From a position of detached reflection, it would be easy to say that the cities should have foreseen the possibility of future rate increases and should therefore have adopted all-inclusive ordinances in 1973 that would have applied to the 1973 rate increase and to all future rate increases.[4] However, even though such an all-inclusive ordinance was not available to the company when it announced the thirteen percent rate increase in its letter of March 29, 1974, the fact remains that it had just recently participated in an extensive hearing on the merits of its earlier fifteen percent rate increase and had known since the adoption of the vehicle ordinances by the cities in October and November of 1973 what type of information the cities would require in ruling upon a proposed rate increase. We conclude that the company is not in a position to argue that the cities had abdicated their rate regulating function at the time the company sought to impose the thirteen percent rate increase in the spring of 1974. Consequently, the circuit court was correct in ruling that the company had no legal authority to unilaterally impose the thirteen percent rate increase.
In case # 11458, the matter of the fifteen percent rate increase imposed on August 13, 1973, the judgment of the circuit court will be modified to permit the company to charge and collect the rate increase imposed on August 13, 1973, up to the dates on which the ordinances reducing said rate increase were adopted by the cities in the spring of 1974 following the rate hearing held in March of 1974. As modified, the judgment is affirmed.
In case # 11481, the matter of the thirteen percent rate increase announced by the company on March 29, 1974, the judgment of the circuit court is affirmed.
DUNN, C. J., and PARKER, Circuit Judge, concur.
COLER, J., concurs specially.
RENTTO, Retired Judge, concurs and dissents.
PARKER, Circuit Judge, sitting for DOYLE, J., disqualified.
RENTTO, Retired Judge, sitting for WINANS, J., disqualified.
COLER, Justice (concurring specially).
While I concur in the result reached by the majority opinion, I cannot agree with that part of the opinion that tends to proscribe the cities' powers to regulate utilities under the then existing authority of SDCL 9-35-1. Under that statute only the franchise, of necessity, must take the form of an ordinance which may or may not be, in part, a "vehicle ordinance."
In the exercise of its police powers a municipality is empowered "to enact, make, amend, revise, or repeal all such ordinances resolutions, and regulations as may be proper and necessary to carry into effect the powers granted thereto." (emphasis supplied) SDCL 9-19-3.
Suggesting that the regulation of the city must take the form of an ordinance, the *860 least flexible and most time consuming method of effecting regulation and which is also subject to referendum, as a condition precedent to rate making by a governing board, is neither desirable nor necessary from the standpoint of due process for either the public or the utilities.
No "vehicle ordinance" is before this court for review, nor is any franchise ordinance, which may well contain the language which governs the procedure for rate filings, hearings and determinations. Whether the initial action of the municipality takes the form of an ordinance, resolution, regulation or order, I believe we should look to the content of the writing setting forth the action, not the designation, to determine whether due process is afforded.
RENTTO, Judge[*] (concurring and dissenting).
I concur in the disposition made in # 11458 but dissent from the result reached in # 11481.
At common law a public utility had the power to fix its rates. Southern Bell Tel. & Tel. Co. v. The Tennessee Public Service Commission, 202 Tenn. 465, 304 S.W.2d 640. The cases and authorities cited in the majority opinion uniformly hold that it retains the power until the public body entrusted with rate making authority establishes a different rate. Since the cities had not fixed such rate when the utility promulgated its 13% increase, effective May 1, 1974, its action was permissible and effective.
The opinion departs from this rule by holding that the utility, when it initiated the increase in # 11481, had been deprived of the right to fix its rates because at that time the cities had evidenced an interest in exercising their statutory power to fix rates pursuant to SDCL 9-35-1. In my view this falls short of the establishment of a different rate. Even in those cases where a rate prescribed by a regulatory agency has been set aside, or for other reasons becomes of no effect, it is held that the utility may unilaterally fix its rates. 73 C.J.S. Public Utilities § 15. Because of the indefiniteness inherent in the rule as applied in # 11481, I think it will prove unworkable and troublesome.
NOTES
[1] We have considered the cities' contention that the company's assignments of error are insufficient to present any question for review. The assignments, although perhaps not as detailed and specific as might be desired, are sufficient to present the questions that the company has set forth in its briefs.
[2] Ch. 283, Laws of 1975, effective July 1, 1975, amended SDCL 9-35-1 by deleting, inter alia, the above quoted language from that statute. The effect of Chapter 283 is to transfer the authority to regulate electric utility rates from municipalities to the South Dakota Public Utilities Commission.
[3] We note that neither the cities nor the company saw fit to include copies of the 1973 vehicle ordinances in the settled record in these cases.
[4] We were advised at oral argument that the cities adopted this type of ordinance in May of 1974.
[*] Retired Supreme Court Judge acting pursuant to SDCL 16-8-13.