Christopher P. SCHERMER, et al., on behalf of themselves and all others similarly situated, Appellants,

v.

STATE FARM FIRE AND CASUALTY COMPANY, et al., Respondents.

Nos. A04–2088, A04–2054.

Supreme Court of Minnesota.

Sept. 14, 2006.

Louise D. Bjorkman, Lawrence R. King, T. Joseph Snodgrass, Shawn M. Raiter, Larson King, LLP, Saint Paul, MN, Charles S. Zimmerman, J. Gordon Rudd, Zimmerman Reed, P.L.L.P., Minneapolis, MN, Rhett A. McSweeney, McSweeney & Fay, Minneapolis, MN, Charles N. Nauen, Robert K. Shelquist, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for Appellants.

Todd A. Noteboom, William L. Greene, Daniel Oberdorfer, Douglas R. Boettge,

Monica L. Davies Leonard, Street and Deinard, Minneapolis, MN, for Respondent.

Mike Hatch, Attorney General, Daniel S. Goldberg, Assistant Attorney General Office of the Attorney General for the State of Minnesota, Saint Paul, MN, for Amicus Curiae State of MN.

Sharon L. Van Dyck, Schwebel, Goetz & Sieben, P.A., Minneapolis, MN, Jeffrey D. Bores, Chestnut & Cambronne, P.A., Minneapolis, MN, for Amicus Curiae MN Trial Lawyers Association.

## OPINION

HANSON, Justice.

Appellant Christopher P. Schermer and other homeowner's insurance policyholders (the Class) commenced this class action against their insurer, respondent State Farm Fire and Casualty Co. (State Farm), alleging that the surcharge that was imposed by State Farm on homes whose electrical systems were more than 39 years old was racially discriminatory. The district court granted summary judgment dismissing the complaint on the alternative grounds that the complaint failed to state a cause of action and that the filed rate doctrine prevents a court from retroactively changing a rate that has been filed with and approved by a state regulatory agency. The court of appeals affirmed summary judgment on both grounds. We affirm on the filed rate doctrine.

To place the Class's allegations in context, we will first describe the regulatory system established by the Minnesota Legislature for the review and approval of insurance rates. Insurers operating in Minnesota are subject to investigation and regulation by the Minnesota Department of Commerce (DOC). *See* Minn.Stat. § 60A.031 (2004). One regulatory requirement is that all insurers must file their proposed rates with the DOC before the rates can become effective. Minn.Stat. § 70A.06, subd. 1 (2004). The DOC is authorized to review these proposed rates to ensure that they are not excessive, inadequate, or unfairly discriminatory. Minn. Stat. § 70A.04, subd. 1 (2004). The general standards defining discriminatory rates are contained in Minn.Stat. § 70A.04, subd. 4 (2004). More specific prohibitions against discrimination are contained in Minn.Stat. § 72A.20 (2004), the anti-redlining statute. These latter prohibitions are the basis for the Class's complaint.

Section 72A.20 prohibits "charging differential rates for an equivalent amount of homeowner's insurance coverage * * * solely because * * * of the age of the primary structure sought to be insured." Minn.Stat. § 72A.20, subd. 13(b) (2004).[1] An exception to that prohibition is made for the use of rating standards that are based on "the age of the insured structure's plumbing, *electrical*, heating or cooling system or other part of the structure, the age of which affects the risk of loss." *Id.* (emphasis added). The substance of the Class's claim is that a surcharge applicable to the Class under one of State Farm's homeowner's insurance rating plans violated this statute because, the Class alleges, although it was purportedly based on the age of an insured's electrical system, it was actually based on the age of the insured's structure.

---

1. Section 72A.20 was revised by the Minnesota Legislature in 2005, but the language we cite was not affected.

With this context in mind, we turn to the facts, which are not disputed. On May 8, 1997, State Farm filed with the DOC a rate plan known as the "Utilities Rating Plan" (URP). As eventually approved by the DOC, the URP gave homeowners a discount or a surcharge, as a percentage of their base premium, depending on the age of their electrical system. The discount ranged from 2% for an 8–year–old electrical system, to 25% for a new system. Homeowners with systems between 9 and 39 years old received no discount or surcharge. Homeowners with systems older than 39 years old were required to pay a 6% surcharge.

To support the proposed URP, State Farm submitted actuarial exhibits to demonstrate that there was a higher risk associated with older electrical systems. But the actuarial data State Farm submitted used all noncatastrophic losses (e.g., fire, water damage, theft, etc.), not just those losses directly caused by older electrical systems. The Class alleges that this lack of actuarial support for the surcharge constitutes a violation of the redlining prohibitions of section 72A.20.

Before ultimately approving the URP, the DOC rejected it three times as being in violation of section 72A.20, for reasons unrelated to the actuarial exhibits. Each time State Farm responded by making the required changes to comply with the statute and resubmitting the URP for approval. In conjunction with each rejection, the DOC indicated that State Farm's "file would be held in suspense" until it made the required changes. After making all required changes, State Farm submitted

the final URP and the DOC approved it on July 23, 1997.

In 2001 a State Farm policyholder filed a complaint with the DOC after he received notice that his premium was going to increase under the URP because his electrical system was approaching 40 years of age. The DOC initiated an investigation and requested that State Farm provide actuarial data to support the URP. State Farm responded that it did not have electrical system cause-of-loss data to support its URP rates. After an 18–month investigation the DOC investigator concluded that State Farm's URP is actually based on the age of the insured's home, which is "illegal according to Minn.Stat. § 72A.20, subd. 13(b) (2000)." Specifically, the investigator interpreted section 72A.20, subd. 13(b), to require actuarial support of losses specifically attributable to older electrical systems.

The DOC drafted a cease and desist order that was presented to State Farm in October of 2002. The order alleged that State Farm violated several statutes, including section 72A.20, subdivision 13(b). State Farm agreed to an informal disposition. In a consent order, State Farm denied the allegations but agreed to cease the URP plan and pay investigative costs of $75,000. The consent order contained no factual or legal findings, but resolved "any and all claims by the Commissioner arising out of the activities related to [State Farm's] URP program."[2] The public had no input in the resolution of this matter and nothing about the complaint, investigation, or consent order became public until after the matter was final, on

---

**2.** On January 21, 2004, while this action was pending, State Farm submitted an identical URP to the DOC using the same type of actuarial support. This time the DOC rejected its investigator's 2002 interpretation of section 72A.20, subdivision 13(b), and again ap-

proved State Farm's URP. A few months after the URP's April 1, 2004, effective date, Governor Pawlenty ordered the DOC to suspend its approval of the URP pending the outcome of this litigation.

December 4, 2002, when the DOC issued a press release.

Two days later the Class commenced this action. On September 12, 2003, the Class was certified to include "[a]ll insurance policyholders issued policies * * * between the dates of August 1, 1997 and February 15, 2003 that cover homes * * * the premiums for which included surcharges based on State Farm's Utility Rating Plan." The Class does not include all homeowner's insurance policyholders affected by the URP because it does not include those who received a discount or those who paid the base premium.

The parties made cross-motions for summary judgment and on September 3, 2004, the district court entered a series of orders. The court denied the Class's motion for summary judgment because it concluded that there was a genuine issue of material fact on the issue of whether the URP violated section 72A.20, subd. 13(b). But the court granted State Farm's motion for summary judgment because it concluded, first, that section 72A.20, subd. 13(b), does not afford a private right of action and, second, that the filed rate doctrine precluded collateral judicial review of a rate filed with and approved by the DOC.

The court of appeals affirmed the grant of summary judgment on both grounds. We granted review on both issues but because we conclude that the filed rate doctrine bars the Class's claims, we need not reach the issue of whether the Class otherwise had valid statutory or common law claims.

I.

We review a district court's grant of summary judgment to determine whether there are any genuine issues of material fact and whether the court erred in its application of the law. *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.

1995). We view the evidence in the light most favorable to the party against whom summary judgment was granted. *Id.* Accordingly, we assume as true the Class's allegation that State Farm's rates were racially discriminatory, in violation of Section 72A.20, subd. 13(b). We consider whether the Class's claims are nevertheless barred by the filed rate doctrine.

The origin of the filed rate doctrine can be traced back to a 1922 United States Supreme Court decision, *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The Court held that an award for treble damages is not available in an antitrust action by a private shipper challenging a rate that was submitted to and approved by the federal Interstate Commerce Commission. *Id.* at 165, 43 S.Ct. 47. The Court reasoned that a party cannot suffer injury by paying a filed rate because:

> [t]he legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

*Id.* at 163, 43 S.Ct. 47. The Court also explained that any award to the plaintiff of a refund of a portion of the filed rate would discriminate against nonsuing ratepayers or ratepayers who sued but received different jury awards. *Id.* The Court concluded that "it is possible that no lower rate [on the goods] could have been legally maintained without reconstituting the whole rate structure for many articles moving in an important section of the country." *Id.* at 164, 43 S.Ct. 47.

The Supreme Court did not explain the precise rationale for the filed rate doctrine,

but hinted at separation of powers concerns, explaining that Congress had conferred on the Commerce Commission the authority to determine whether a rate is reasonable and not discriminatory. *Id.* The Court also identified a justiciability concern, recognizing that a court is not well-suited to determine, if the rate approved by the commission were found to be unlawful, what other rate the commission would find to be reasonable and non-discriminatory to take its place. *Id.* at 164–65, 43 S.Ct. 47. In other words, in order to assess the damages that were caused by the unlawful rate, a court would need to predict what the commission would determine was a lawful rate and then compare the two.

In *Arkansas Louisiana Gas Co. v. Hall* (*Arkla*) the Supreme Court expanded on its separation of powers concerns in a contract dispute over the sale of natural gas between a natural gas producer and a buyer. 453 U.S. 571, 573, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The producer sued to retroactively enforce an increase in rates that the contract made effective if the buyer bought gas from another producer at a higher price. *Id.* at 573–74, 101 S.Ct. 2925. The Court recognized that the Natural Gas Act prevented the Federal Power Commission from retroactively imposing a rate increase on gas already sold. *Id.* at 578, 101 S.Ct. 2925. Accordingly, the Court reasoned that "[i]t would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what

the Commission itself may not do." *Id.* at 578, 580, 101 S.Ct. 2925. The Court said:

> It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act.

*Id.* at 579, 101 S.Ct. 2925. The Court concluded that any award of damages that required a court to speculate about whether the commission would have approved the proposed higher rate would constitute impermissible retroactive ratemaking. *Id.* at 578–79, 101 S.Ct. 2925.[3]

In one of the most frequently cited opinions interpreting the federal filed rate doctrine, the Second Circuit Court of Appeals emphasized that regulatory agencies have special expertise, investigative capacities, and experience and familiarity with the regulated industry that enable them to "consider the whole picture regarding the reasonableness of a proposed rate," whereas the courts are ill-suited to second-guess the decisions of regulatory agencies. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20–21 (2d Cir.1994).

Although these cases involved challenges to rates filed with federal agencies under federal statutes, the rationale underlying the filed rate doctrine has also been applied to rates filed with state agencies. *See, e.g., Wegoland,* 27 F.3d at 20; *Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.1992); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 494 (8th Cir. 1992). Of course the adoption and application of the doctrine to rates filed with state

---

**3.** The Supreme Court later explained that the filed rate doctrine does not provide antitrust immunity. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). The Court said that the activities of a regulated industry are still "subject to scrutiny under the antitrust laws by the Government and to

possible criminal sanctions or equitable relief." *Id.* The Court concluded that these criminal and equitable safeguards and the apparent Congressional acquiescence to this "settled" area of law provided sound reasons for not overruling *Keogh. Square D. Co.,* 476 U.S. at 422, 106 S.Ct. 1922.

agencies is a matter of state law and is not controlled by federal precedent. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir.2000). Nevertheless, most states have adopted the filed rate doctrine, and many apply it to insurance regulation. *See, e.g., Horwitz v. Bankers Life & Cas. Co.*, 319 Ill.App.3d 390, 253 Ill.Dec. 468, 745 N.E.2d 591 (2001); *Commonwealth ex rel. Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48, 52 (Ky.Ct. App.1999); *N.C. Steel, Inc. v. Nat'l Council on Comp. Ins.*, 347 N.C. 627, 496 S.E.2d 369, 372 (1998); *Byan v. Prudential Ins. Co. of Am.*, 242 A.D.2d 456, 662 N.Y.S.2d 44 (N.Y.App.Div.1997).

As noted above, the Supreme Court has implied several possible rationales of the federal filed rate doctrine but has not committed itself to one. *See Arkla*, 453 U.S. at 573, 101 S.Ct. 2925 (separation of powers, legislative intent); *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 459–60, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (separation of powers); *Keogh*, 260 U.S. at 162–63, 165, 43 S.Ct. 47 (separation of powers, legislative intent, and justiciability). Some states have been more explicit about the rationale. Kentucky views the filed rate doctrine as a specific application of separation of powers. *Commonwealth ex rel. Chandler*, 8 S.W.3d at 53 (explaining that rate setting is a legislative function that is outside the scope of judicial review). North Carolina also approaches the filed rate doctrine from the perspective of separation of powers, recognizing the need to effectuate legislative intent. *N.C. Steel, Inc.*, 496 S.E.2d at 372 (stating that the legislative intent to preclude interference by the courts was evidenced by the comprehensive regulatory scheme in place for insurance companies). Many states treat the filed rate doctrine as a matter of comity, whereby the courts give deference to the agency's expertise if the claim requires the court to determine the reasonableness

of a rate. *See, e.g., Amundson & Assocs. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc.*, 26 Kan.App.2d 489, 988 P.2d 1208, 1214–15 (1999); *Edge v. State Farm Mut. Auto. Ins. Co.*, 366 S.C. 511, 623 S.E.2d 387, 391–92 (2005).

■ This court has not directly decided whether the filed rate doctrine applies to rates established by Minnesota regulatory agencies, but we have recognized some of the separation of powers concerns that underlie the doctrine. Thus, in *Northern States Power Co. v. City of St. Paul*, we said that "prescribing or fixing rates for a public utility involves a legislative function which may not be usurped by the courts." 256 Minn. 489, 493, 99 N.W.2d 207, 211 (1959). And in *Northwestern Bell Telephone Co. v. State*, we reaffirmed this principle, stating that "[r]atemaking is a legislative and not a judicial function." 299 Minn. 1, 28, 216 N.W.2d 841, 857 (1974). We have also recognized that certain aspects of the ratemaking function, such as the allocation of rates among classes of customers, are peculiarly legislative in nature. *St. Paul Area Chamber of Commerce v. Minn.Pub. Serv. Comm'n*, 312 Minn. 250, 255–56, 262, 251 N.W.2d 350, 354, 358 (1977) (emphasizing that the agency has "technical expertise" and is able to balance many competing interests and holding that, unlike a court, the agency may draw on its "own internal sources of knowledge and experience" and is not limited to the evidentiary record). Finally, we have applied the doctrine indirectly where federally regulated rates produced costs that were sought to be passed on through state regulated rates. *See Northern States Power Co. v. Minn. Pub. Utils. Comm'n*, 344 N.W.2d 374, 381 (Minn.1984) (holding that a federal agency's approval of allocations of plant abandonment losses between two electric companies established a formula wholesale rate, "the rea-

sonableness of which cannot be relitigated in a retail rate proceeding [for one of the companies] before a state utilities commission").

■ We now consider whether we should adopt a filed rate doctrine for regulated rates filed with Minnesota regulatory agencies and, if so, what exceptions should be recognized. The Class suggests that the filed rate doctrine is grounded solely in justiciability concerns. They argue that the doctrine should not apply in this case because their challenge is not to the reasonableness of the URP, but to its legality, which is a matter within the peculiar expertise of courts. And the Class urges that the surcharge that class members paid under the URP is a judicially ascertainable amount. But we conclude that the Class's argument underestimates the extent to which a court-ordered refund of State Farm's surcharge would interfere with the regulatory scheme established by the legislature and with the ratemaking functions of the DOC. We also conclude that the filed rate doctrine should reflect separation of powers and comity considerations that the Class's argument overlooks.

From the standpoint of separation of powers, we must start with our precedent recognizing that ratemaking is a legislative function. *Northwestern Bell Tel. Co.*, 299 Minn. at 28, 216 N.W.2d at 857; *N. States Power Co.*, 256 Minn. at 493, 99 N.W.2d at 211. Although that precedent has arisen primarily in the context of electric, gas, and telephone utilities, the principle applies equally to the rates of insurers because insurance is similarly regarded as a business that is "affected with a public interest." George J. Couch, *Couch on Insurance* § 21.1 (2d ed.1984); *see also Itasca Paper Co. v. Niagara Fire Ins. Co.*, 175 Minn. 73, 75, 220 N.W. 425, 426 (1928). Indeed, one of the reasons that states began to regulate insurance rates was to assure the solvency of insurers so that they could be relied on to pay policyholder claims. Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance* § 3.7, at 385 (2d ed.1996); *see* Minn.Stat. § 70A.04, subd. 3 ("Rates are inadequate only if they will endanger the solidity of an insurer that uses them or if they are insufficient to sustain projected losses and expenses within the state."). Thus, if a court were to entertain a private claim that a regulated rate was unreasonable or unlawful, it would necessarily have to second-guess the decisions of the agency to whom the legislature has delegated the responsibility to approve rates, and a court generally would not have the technical expertise to do so nor the capacity to consider the entire rate structure or to balance all competing interests.

■ From the standpoint of both separation of powers and comity, we note that the statutory system for the regulation of insurance rates in Minnesota is comprehensive. *See generally* Minn.Stat. chs. 45, 60A, 70A, 72A (2004). That regulatory system specifically delegates to the DOC the responsibility to review all rates for reasonableness. Minn.Stat. 70A.04, subd. 1. In performing that review, the DOC is directed to protect the interest of ratepayers against excessive rates, but also to balance the interests of ratepayers against the right of the regulated entity to charge adequate rates. Minn.Stat. §§ 70A.01, subd. 2, 70A.04, subd. 1. Thus, when a regulatory agency approves rates, it seeks to achieve a balance by assuring that the rates are not excessive for ratepayers but yet are adequate to satisfy the regulated entity's due process right to earn a reasonable return. *Hibbing Taconite Co. v. Minn. Pub. Serv. Comm'n*, 302 N.W.2d 5, 10; *see* Minn.Stat. §§ 70A.04, 70A.05. And, for insurance rates specifically, "[r]ate regulation is designed to generate premium

charges that are equitable for each policy-holder-insured as well as yield insurers a fair return for the risks undertaken." *Holmes & Rhodes, supra*, § 3.7, at 385. When a court is asked to determine whether one part of the rate structure is unlawful, as applied to a subset of ratepayers, it must necessarily interfere with the function delegated by the legislature to the DOC, and it has neither the expertise nor the mechanisms to deal with the entire rate structure or the adequacy of the return to the regulated entity.

From the standpoint of justiciability, we have recognized that courts are ill equipped to retroactively reallocate rates among ratepayers, by modifying the rates for some ratepayers but not for others. *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 535 (Minn.1985). We have said that the regulation of rates is an "intricate ongoing process" and interference by a court "may set in motion an ever-widening set of consequences and adjustments" which courts are powerless to address. *Id.* To illustrate this point, it is helpful to compare the power of a court with the authority of the DOC in dealing with insurance rates. Here, the court only has jurisdiction over the Class members, a subset of ratepayers who were subject to the surcharge. It does not have jurisdiction over the rate-payers who received a discount or those who paid only the base premiums. If the court were to retroactively adjust the rates of only the Class members, it would inevitably disrupt the balancing of interests achieved by the DOC when the rates were approved because the court has no jurisdiction to reallocate rates among other customer classes to assure that in total, the rates are adequate for State Farm. Thus, the Court could not increase other policyholder's rates to protect State Farm from the shortfall in revenues that would

be produced by any refund of the surcharges.

The DOC, on the other hand, does have authority to address all of State Farm's rates on a prospective basis. If, as the Class alleges, the surcharge mechanism is unlawful, the DOC can order State Farm to discontinue the entire URP, not just the collection of the surcharge. The DOC can deal comprehensively with the rate plan and, if it eliminates a surcharge for some policyholders, it can simultaneously eliminate the discount for other ratepayers. And, if these two features are not essentially offsetting, the DOC can establish new base rates that ensure that the return to State Farm is adequate but not excessive.

This comparison makes it clear that the Class's argument, that the filed rate doctrine is based solely on justiciability concerns, is incorrect. Even though the amount of the surcharges actually paid by Class members can be calculated, an award of that amount as damages would require the court to speculate about whether the DOC would have approved this lower, nonsurcharge rate as the reasonable and lawful rate. *See Arkla*, 453 U.S. at 578–79, 101 S.Ct. 2925. An award of that amount as damages to some rate-payers would completely alter the allocation among classes of customers that the DOC had approved. And, perhaps more important, the court's limited jurisdiction would prevent it from implementing any adjustments for other customer classes.

From the standpoint of legislative intent, the Class argues that the legislature's intent that the filed rate doctrine not apply is expressed in Minn.Stat. § 72A.26 (2004), which allows the courts, not the DOC, to make the final determination as to whether section 72A.20 has been violated. But section 72A.26 does not apply here because it only allows direct review by the district

court of a DOC-initiated investigation that results in a report of the Commissioner that fails to charge a violation of one of the unfair practices statutes. And section 72A.26 only authorizes the district court to issue injunctions and other "appropriate orders and writs," not to grant damages to a subset of policyholders or to retroactively adjust one part of the rate structure adopted by the DOC.

We also disagree with the Class's argument that the legislature's intent is expressed in Minn.Stat. ch. 8 (2004), which this court has interpreted to permit the attorney general to take action against insurers for unfair insurance claims practices. *See Morris v. Am. Family Mut. Ins. Co.,* 386 N.W.2d 233, 236 (Minn.1986). Again, this statute does not authorize the attorney general to secure retroactive refunds of insurance rates already paid.[4]

We conclude that the legislative intent that the filed rate doctrine should apply to insurance rates is reflected in Minn.Stat. § 70A.11 (2004). That section addresses the refund authority of the DOC and restricts that authority to only order refunds that are calculated from "the commencement date of the contested case hearing on the rate." In the words of the district court, this "gives the insurer notice that its accepted rates are being challenged and provides the opportunity to either discontinue them or proceed at its peril." This statute reinforces the principles that underlie the filed rate doctrine. By restrict-

ing the authority of the DOC to order refunds to only those cases where a formal contested case proceeding has been commenced, and to only those rates that were charged after the contested case proceeding was commenced, the statute severely limits the ability of the DOC to make retroactive refunds. Here, for example, because no contested case was commenced, the DOC would have no authority to order refunds of the surcharge. Because of the separation of powers and comity concerns outlined above, courts should be reluctant to do what the regulatory agency is powerless to do. *Arkla,* 453 U.S. at 578, 101 S.Ct. 2925.[5]

■■ Finally, the Class argues that the application of the filed rate doctrine would violate the right of the Class, under the Minnesota Constitution, to have "a certain remedy in the laws for all injuries or wrongs." Minn. Const. art. I, § 8. But the Minnesota Constitution only protects "remedies for which the legislature has not provided a reasonable substitute." *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 14 (Minn.1986). Thus, even if we were to conclude that the Class had a valid common law cause of action for rescission, the Remedies Clause is not violated because the legislature has provided a reasonable substitute. The statutes that regulate insurance companies in general and rates in particular—including the rate filing requirements, the DOC review requirements, the DOC investigative respon-

---

**4.** We do not decide here that the filed rate doctrine prevents the state through the attorney general from enforcing insurance rate statutes through criminal sanctions, injunctions, equitable relief, or civil fines and penalties. *See Square D Co.,* 476 U.S. at 422, 106 S.Ct. 1922.

**5.** Legislative intent for application of the filed rate doctrine is also reflected in Minn.Stat. § 72A.08, subd. 1 (2004), which provides "[n]o insurance company * * * shall make or

permit any advantage or distinction in favor of any insured * * * with respect to the amount of premium named in, or to be paid on, any policy of insurance, or shall offer to pay or allow * * * as inducements to insurance, any rebate or premium payable on the policy." Because the Class's claim is for rescission of the URP surcharge, they are asking for a return of the payments they have already made. This is precisely what section 72A.08, and the filed rate doctrine, prohibit.

sibilities, and the DOC and district court enforcement capabilities—provide remedies that ensure protection of the interests of ratepayers. In fact, the collective requirements of those statutes relieve individual ratepayers of the burden of reviewing, monitoring, or challenging rates and, instead, charge the DOC with the responsibility to assure ratepayers that rates will not be excessive. This regulatory scheme is a reasonable substitute for the common law claim that the Class will be prevented from asserting.

■ For all of these reasons—because the regulation of insurance rates is a legislative, not a judicial function; because the Minnesota Legislature has established a comprehensive system for regulating insurance rates and has delegated the administration of that system to the DOC; because only the DOC has the capacity to determine what is a reasonable rate structure for an insurer, by balancing the interests of ratepayers and insurers and by allocating fairly among classes of ratepayers; because the legislature has severely restricted the authority of the DOC to make retroactive refunds or rebates; and because the legislature has substituted regulatory remedies to protect all policyholders in place of the private remedies that individual policyholders might possess—we conclude that the filed rate doctrine applies generally to rates filed with and approved by the DOC. And, unless there is some basis for an exception, the filed rate doctrine would bar the Class's claims.

## II.

Some courts that have adopted the filed rate doctrine have recognized exceptions to that doctrine. *See, e.g., Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944–45 (8th Cir.2006) (holding that where a rate filed with a state regulatory agency violates a federal antidiscrimination statute, the federal statute predominates under the Supremacy Clause and the filed rate doctrine is inapplicable); *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 393–94 (9th Cir. 1992) (recognizing an exception where there was minimal review by the regulatory agency); *Am. Bankers Ins. Co. v. Alexander*, 818 So.2d 1073, 1085 (Miss.2001) (recognizing an exception where there was a claim of breach of fiduciary duty), *overruled on other grounds by Capital City Ins. Co. v. G.B. "Boots" Smith Corp.*, 889 So.2d 505 (Miss.2004).[6]

■ The Class argues that we should recognize an exception to the filed rate doctrine where the regulatory agency's review and investigation authority is passive. The Class argues that the doctrine should not be applied here because the DOC's authority to review a complaint and initiate an investigation is discretionary, rate filings are not subject to public input, and the DOC does not "determine" insurance rates but instead only reviews rates submitted by insurance companies.

The Class relies on *Brown v. Ticor Title Insurance Co.* where the Ninth Circuit Court of Appeals held that the filed rate doctrine did not apply to bar federal antitrust claims challenging state insurance rates. 982 F.2d at 394. The court relied exclusively on the fact that the regulatory schemes in Arizona and Wisconsin did not require affirmative approval of the rates,

---

**6.** We do not decide whether a claim brought under the Minnesota Human Rights Act, Minn.Stat. § 363A.33, subd. 1 (2004), would be an exception to the filed rate doctrine in Minnesota. We note that the Class moved to amend the complaint to add a MHRA claim, but that the district court denied that motion. The Class did not appeal this ruling. Accordingly, there are no issues involving the MHRA before us.

only the absence of disapproval. *Id.* at 393. The court explained:

> [I]f those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge. The absence of meaningful state review allows the insurers to file any rate they want. Therefore, the act of filing does not legitimize a rate arrived at by improper action.

*Id.* at 394.

We find *Brown* unpersuasive. Unlike the Ninth Circuit's description of Arizona and Wisconsin law, insurance rates in Minnesota are subject to meaningful review. Minnesota Statutes § 60A.03, subdivision 2 (2004), provides that

> [t]he commissioner *shall* have and exercise the power to enforce all the laws of this state relating to insurance, and *shall* enforce all the provisions of the laws of this state relating to insurance in the manner provided by the laws defining the powers and duties of the commissioner of commerce * * *.

(Emphasis added.) Insurers *"shall* file with the commissioner all rates," and "rates *shall not* be excessive, inadequate or unfairly discriminatory." Minn.Stat. §§ 70A.06, subd. 1 (emphasis added), 70A.04, subd. 1 (emphasis added); *see also* Minn.Stat. §§ 72A.20, 72A.201 (2004). Consistent with this legislative mandate, the DOC did review State Farm's URP and rejected it three times before finally approving it.

Further, the DOC has a continuing, legislatively-mandated obligation to "examine the affairs and conditions of every insurer licensed in this state not less frequently than once every five years." Minn.Stat. § 60A.031, subd. 1 (2004). And it has broad authority to "examine the affairs and conditions" of any insurance company doing business in Minnesota "[a]t any time and for any reason related to the enforcement of the insurance laws, or to ensure that companies are being operated in a safe and sound manner and to protect the public interest." *Id.; see also* Minn.Stat. § 72A.21 (2004). Consistent with this legislative authorization, the DOC initiated an 18–month investigation on State Farm's URP in response to a complaint from a single ratepayer. Finally, the DOC has broad authority to seek injunctions, levy fines and penalties, issue cease and desist orders, and to revoke or suspend licenses to do business. Minn.Stat. §§ 45.027, subds. 5, 5a, 5b, 6, 7, 70A.06, 72A.25, 72A.201, subd. 1 (2004).

Concededly, the insurance regulatory scheme is less stringent than, for example, the scheme for electrical, gas, and telephone utilities. *Compare* Minn.Stat. 216.-B.16 (2004) (contemplating contested case proceedings to determine electric and gas rates, with participation of state agencies on behalf of ratepayers and intervention of ratepayer groups), *with* Minn.Stat. § 70A.04, subd. 2 (allowing competition to be the benchmark for excessiveness). But this difference in degree of regulation is one that the legislature has chosen and it does not materially impact the rationale for the filed rate doctrine.

In this respect, we echo the comments of the Wisconsin Supreme Court in *Prentice v. Title Insurance Co.*, 176 Wis.2d 714, 500 N.W.2d 658 (1993). There, the court examined the filed rate doctrine in the context of insurance rate regulation that is less comprehensive than in Minnesota. In fact, the Wisconsin court contrasted Wisconsin's "use before file" regulation with the more restrictive "file before use" regulation like Minnesota's. *Id.* at 725, 500 N.W.2d at 662. The court concluded that even Wisconsin's less restrictive scheme

provided an adequate regulatory remedy because the Commissioner of Insurance was empowered to establish minimum standards for loss ratios, to require that rates be filed and approved, and to disapprove of any rate that was "excessive, inadequate, or unfairly discriminatory" or which had "the effect of destroying competition or creating a monopoly." *Id.* at 726, 500 N.W.2d at 662–63. The court stated: [7]

> Under the filed rate doctrine as enunciated in *Keogh*, the availability of such a regulatory remedy bars a private rate-related suit for damages. To hold otherwise would undermine the regulatory scheme by allowing courts to award damages based on a rate which was never filed with the Insurance Commissioner. If courts were authorized to determine whether a hypothetical rate would have been approved by the Insurance Commissioner, we would place insurers in a procrustean bed where one rate must conform to the requirements of both the Insurance Commissioner and a trier of fact. In order to uphold the regulatory scheme enacted by the Legislature, we conclude that the Insurance Commissioner serves as the plaintiff's sole source of relief.

*Id.* at 726–27, 500 N.W.2d at 663.

We hold that the filed rate doctrine bars the Class's challenge to State Farm's URP.

Affirmed.

MEYER, J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. I disagree with the court's characterization of the issue presented as being merely whether we should recognize a passive review exception to the filed rate doctrine. I believe that the nature of the Minnesota insurance regulatory scheme, the structure of State Farm's URP, and the type of claim asserted by the class when viewed together undermine each rationale for adopting the filed rate doctrine in this case. The court's expansion of the doctrine to the extreme facts of this case sets dangerous precedent that will allow quasi-regulated industries to avoid the consequences of their unlawful behavior.

### I.

The court justifies applying the filed rate doctrine to bar this class action based on the principles of separation of powers and effectuating the legislature's intent, but application of the filed rate doctrine serves neither of these goals. Nor do the other traditional rationales have any application here.

### A. Justiciability

One rationale for the filed rate doctrine is justiciability. Because a rate is deemed reasonable when it has been filed and approved by the regulatory agency, in order for a court to calculate damages in an antitrust or RICO action the court would have to determine what the hypothetical alternative reasonable rate would have been without the illegal conduct. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir.1994). Because this involves expertise unique to the administrative agency assigned to oversee those rates, it is a deter-

---

7. The court reached this conclusion even though the passivity of regulation was such that the United States Supreme Court, in *FTC v. Ticor Title Insurance Co.*, 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), had found it insufficient to constitute "state action" that would shield the companies from antitrust liability, stating: "This determination, however, does not change the fact that the Wisconsin Insurance Code provides the plaintiffs with a [regulatory] remedy for the violation alleged in the present case." 176 Wis.2d at 728, 500 N.W.2d at 663.

mination that courts are ill-equipped to make. *Id.* at 19, 21.

This case does not require a jury or a court to speculate on the hypothetical alternative reasonable rate that would have been set without State Farm's allegedly illegal conduct. The class's damages would simply be the cumulative difference between each individual homeowner's base rate, and the rate they paid with the URP surcharge. Because the surcharge is calculated according to a percentage of the homeowner's base rate, the class's damages are calculable with mathematical precision. Thus, the justiciability concern has no place here.

### B.   Rate Discrimination

Another rationale for the filed rate doctrine is the avoidance of discriminatory rates among ratepayers. When first identifying this rationale, the Supreme Court expressed caution over recovery based on an amount less than the filed rate because it "might, like a rebate, operate to give [the plaintiff] a preference over his trade competitors." *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The Court further explained that even if all ratepayers sued, uniform treatment would not result "unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief." *Id.* Some courts have since expanded this rationale beyond trade competitors to include all ratepayers because it preserves the goal of uniformity of rates. *See, e.g., Wegoland,* 27 F.3d at 21.

Here, members of the class are not trade competitors so there is little concern for giving one a preference over others. Further, the ascertainable nature of the damages and the fact that this is a class action eliminates any concern over varying recoveries and non-uniform rates. Thus,

there is no chance that awarding the class damages in this case would result in discriminatory rates.

Nonetheless, the court, without citation to authority, significantly expands this rate discrimination rationale by focusing not on the possibility of discriminatory rates among trade competitors or consumers, but on the regulated industry's right to earn a reasonable return. Even if this were a legitimate concern for heavily regulated industries, it has no application here. For the general authority that regulated industries are constitutionally entitled to reasonable return, the court cites *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5 (Minn.1980). But *Hibbing Taconite* was an electric utility rate case in which rates are set by the regulatory agency according to a strict set of guidelines outlined by statute and clarified by judicial decisions. *See* Minn.Stat. § 216B.03 (2004); *Nw. Bell Tel. Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974). In Northwestern Bell we explained that:

> The process by which rates are fixed is, first, to determine the value of the company's property represented by the equity of its stockholders; second, to establish a fair rate of return which will provide earnings to investors comparable to those realized in other businesses which are attended by similar risk, will allow the company to attract new capital as required, and will maintain the company's financial integrity; and, third, to compute corporate taxes, depreciation reserves, and other expenses of operating the company. The rates charged subscribers are thereupon authorized in an amount which will equal the sum of the return to investors and the company's operating expenses.

299 Minn. at 5–6, 216 N.W.2d at 846.

In contrast, insurance rates are set by the insurers themselves, not the DOC.

Minn.Stat. § 70A.08, subd. 1 (2004). And more importantly, there is no limit on the amount of the rate so long as "a reasonable degree of price competition exists." Minn.Stat. § 70A.04, subd. 2(a) (2004). The DOC's only function in reviewing rates for excessiveness is ensuring that such competition exists. In this regard, insurance rates are little different from rates set by any other non-regulated industry. Therefore, like non-regulated industries, insurers are free to build litigation expenses into their rates. Further, even when a reasonable degree of competition does not exist, the legislature has directed that in considering rate excessiveness "[d]ue consideration shall be given to past and prospective loss and expense experience * * * and to all other relevant factors." Minn.Stat. § 70A.05(1) (2004). This suggests that litigation costs associated with past rates can be built into future rates regardless of competition.

The court suggests that to allow this action would require speculation over whether the DOC would have approved of the URP without the surcharge. But, in doing so, the court elevates the importance of a rate being adequate over the importance of a rate being non-discriminatory. Given the choice between potentially saddling State Farm with an inadequate rate, or effectively punishing the class for State Farm's allegedly illegal behavior, I would choose the former. It must be emphasized that it was State Farm who designed the URP, not the DOC.

## C. No–Injury Rule

A third rationale for the filed rate doctrine is that, because the filed rate defines the legal rights between a ratepayer and the regulated industry, no economic injury can be suffered by paying the filed rate. The Supreme Court in *Keogh* explained that:

Section 7 of the Anti–Trust Act gives a right of action to one who has been "injured in his business or property." Injury implies violation of a legal right. The legal rights of a shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by tariff cannot be varied or enlarged by either contract or tort of the carrier.

260 U.S. at 163, 43 S.Ct. 47.

The Eighth Circuit Court of Appeals recently distinguished *Keogh* in a case involving facts very similar to this case. In *Saunders v. Farmers Insurance Exchange*, 440 F.3d 940, 942 (8th Cir.2006), homeowners brought federal anti-discrimination actions against several insurers alleging that their underwriting criteria and pricing policies reflected unlawful race discrimination. The district court applied the filed rate doctrine and issued summary judgment in favor of the insurers. The Eighth Circuit reversed, explaining first that the filed rate doctrine is simply a way to harmonize two federal statutes with competing purposes. *Id.* at 944. Because the insurance rate regulatory scheme involved state statutes, the court held that the "Supremacy Clause tips any legislative competition in favor of the federal anti-discrimination statutes." *Id.*

While this case is slightly different in that it does not implicate the Supremacy Clause, the *Saunders* court went on to explain that a state regulatory scheme could still bar a federal claim, depending on the "language, remedies, and purposes of the *federal* statutes at issue." *Id.* The court then focused on *Keogh*'s no-injury rationale and made an appropriate distinction that is relevant here:

RICO and the Sherman Act require a plaintiff to prove injury to "his business or property." 18 U.S.C. § 1964(c). Thus, the no-injury principle of *Keogh* applies to deprive a RICO or antitrust plaintiff of standing under federal law to challenge a filed rate that must be charged under state law. But standing to sue under federal anti-discrimination statutes such as the Fair Housing Act is far broader. If a defendant's pricing policies or practices were the product of unlawful race discrimination, plaintiffs who purchased homeowners insurance at the discriminatory rates have standing to seek relief under these federal statutes even if the defendant was required by state law to charge its filed rates. Thus, as to this limited group of plaintiffs, the no-injury principle of *Keogh* * * * will not support [application of the filed rate doctrine].

*Saunders,* 440 F.3d at 944–45 (citations omitted).

This distinction applies equally to this case. The DOC's review of insurance rates serves four functions: to ensure that rates are not (1) excessive; (2) inadequate; (3) unfairly discriminatory; or (4) being used to engage in unfair price competition. *See* Minn.Stat. § 72A.04, subd. 1 (2004). *Keogh*'s no-injury rule only addressed the first function. When a regulatory agency determines that a rate is not excessive—i.e., reasonable—it necessarily defines the economic rights between the consumer and the regulated entity. A consumer cannot thereafter claim that he was injured because a different reasonable rate should have been paid.

But the same cannot be said for the consumer's right to be free from unlawful racial discrimination. This right has already been defined by statute. *See* Minn. Stat. §§ 70A.04, subd. 1, 72A.20, subd. 13 (2004). The DOC's discrimination review function does nothing to further define the right and certainly does not mean that the rate cannot be discriminatory. It only means that, *in the DOC's opinion,* the rate is not discriminatory. Thus, the no-injury rationale has no application in this case.

### D. Separation of Powers

Related to the no-injury principle is the idea that the filed rate doctrine respects principles of separation of powers when allowing judicial involvement would infringe on the executive branch's role of reviewing rates for reasonableness. But, as already discussed, the class's challenge is not to the DOC's review of the URP's reasonableness, but to the DOC's review of the URP for compliance with an anti-discrimination statute. The latter type of review involves the judicial function of applying facts to the law, not measuring competition, *see* Minn.Stat. § 70A.04, subd. 1, or calculating the insurer's operating expenses and ascertaining a reasonable rate of return while taking into account the risk associated with insuring a particular behavior, *see* Minn.Stat. §§ 70A.04, subd. 2(b), 70A.05, subd. 2. Unlike measuring competition or setting rates, the DOC does not have particular expertise in interpreting statutes or identifying unlawful discrimination. Consequently, far from respecting separation of powers, the court's decision violates separation of powers by delegating a judicial function to an executive official without the availability of judicial review.

State Farm attempts to circumvent this distinction by characterizing this action as a highly complex case centered around interpreting actuarial data. But one of the threshold disputes is over the interpretation of two apparently conflicting provisions of Minn.Stat. § 72A.20, subd. 13 (2004), which does not require interpretation of actuarial data. The main provision

prohibits "charging differential rates for an equivalent amount of homeowner's insurance coverage * * * solely because * * * of the age of the primary structure sought to be insured." Minn.Stat. § 72A.20, subd. 13(b). This suggests that State Farm's URP is permissible if it was in fact based on the age of utility systems within the home, and not solely on the age of the home itself. Subdivision 13, however, does "not prohibit the use of rating standards based upon the age of the insured structure's plumbing, electrical, heating or cooling system or other part of the structure, the age of which affects the risk of loss." Minn.Stat. § 72A.20, subd. 13. By negative implication, subdivision 13 suggests that a rating scheme based on utility systems within the home may also be prohibited if not sufficiently supported by actuarial data. But it is unclear that this is prohibited by the main provision, which is specific to charging differential rates "solely because * * * of the age of the primary structure," instead of more broadly covering the age of the home or a proxy for it.

In other words, the first question a court would be confronted with by this case is whether the statute requires a rating scheme based on utility systems to be supported by actuarial data at all. If not, the fact question becomes whether State Farm's URP was in fact based on the age of the utility systems, or if it was really based on the age of the primary dwelling. This requires no particular expertise or interpretation of actuarial data.

If section 72A.20, subdivision 13, were interpreted to prohibit the charging of differential rates based on the age of utility systems without actuarial support, only then would the interpretation of actuarial data be necessary. But even if this is the correct interpretation, the legislature has already recognized that courts are compe-

tent to interpret actuarial data. The DOC, insurers, and intervenors are allowed to remove a case or appeal to a district court under certain circumstances. Minn.Stat. §§ 14.63 ("Any person aggrieved by a final decision in a contested case is entitled to judicial review of the decision * * *."); 72A.25 (allowing the DOC to file for an injunction in a district court if the DOC charges a violation of, inter alia, Minn.Stat. § 72A.20, and the insurer refuses to discontinue the activity); 72A.26 (allowing any intervenor in a public hearing to seek relief from a district court if the DOC does not charge a violation of, inter alia, Minn. Stat. § 72A.20) (2004). Thus, under the right circumstances this very case could have been heard before a district court. Although this would only allow for the issuance of an injunction instead of damages, in order to support the injunction, the district court would still be required to assess actuarial data to find a violation of section 72A.20, subdivision 13(b). Therefore, any complexity in interpreting actuarial data has no relevance to the separation-of-powers rationale for the filed rate doctrine.

### E. Legislative Intent

The other rationale that the court cites for the filed rate doctrine is that it carries out the intent of the legislature to assign all responsibilities associated with filed rates to the regulatory agency. In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court elevated this rationale over all others when declining to overrule *Keogh*. The Court seemed to acknowledge that certain procedural and judicial developments since *Keogh* may undermine the original rationales for the filed rate doctrine, including

    the development of class actions, which might alleviate the expressed concern about unfair rebates; the emergence of

precedents permitting treble-damages remedies even when there is a regulatory remedy available; the greater sophistication in evaluating damages, which might mitigate the expressed fears about the speculative nature of such damages; and the development of procedures in which judicial proceedings can be stayed pending regulatory proceedings.

*Square D Co.*, 476 U.S. at 423–24, 106 S.Ct. 1922. But the Court recognized "the strong presumption of continued validity" associated with Congressional acquiesce to the judicial interpretation of a statute, which at the time had been in place for 65 years, and held that "[i]f there is to be an overruling of the *Keogh* rule, it must come from Congress, rather than from this Court." *Id.* at 423–24, 106 S.Ct. 1922. Because this court has not yet interpreted the filed rate doctrine to apply to Minnesota's insurance regulatory scheme, Minnesota has no such history of legislative acquiesce to the filed rate doctrine.

The court concludes that the Minnesota Legislature's intent to apply the filed rate doctrine in this case is implied by Minn. Stat. § 70A.11, subd. 1 (2004). Section 70A.11, subdivision 1, reads:

> If the commissioner finds after a contested case proceeding under chapter 14 that a rate is not in compliance with section 70A.04, the commissioner shall order that its use is to be discontinued and shall order the excess premium plus interest at the rate specified in section 549.09 to be refunded to the policyholder. The amount of the refund, plus interest, must be computed from the commencement date of the contested case hearing on the rate.

This applies only to proceedings under the Administrative Procedures Act and only to findings made by the commissioner. It does not apply to judicial proceedings.

The court concludes that this "reinforces the principles that underlie the filed rate doctrine" because an insurer can rely on the DOC's review of its rates. But the class is not challenging the DOC's review of State Farm's rates; they are asking the court to conduct an independent review of them for any race-based discriminatory impact. There is no expression of legislative intent anywhere that the judicial branch not review rates for their discriminatory impact.

In fact, by allowing insurers to set their own rates, the opposite may well be true, that is, by establishing a presumption of reasonableness based on the existence of competition, and by making the DOC's review function passive only, the legislature has expressed its intent that insurance rates be treated like any other rate set by non-regulated industries. The DOC's review function merely recognizes the unique nature of, and the potential for abuse in, the insurance industry.

The court also finds evidence of legislative approval of the filed rate doctrine in Minn.Stat. § 72A.08 (2004) because it prohibits rebates. But section 72A.08, subdivision 1, only prohibits an *insurance company* from giving rebates. It does not apply to a judicial award of restitution for a benefit wrongfully conferred. Further, although subdivision 2 prohibits an insured from receiving a rebate, it clearly does not contemplate prohibiting restitution from a judicial action. If it did, it would conflict with section 70A.11, subdivision 1, which allows for the DOC to order refunds of illegal premiums under certain circumstances.

Finally, even if legislative intent as suggested by the court can be implied, we have long recognized that "statutes are presumed not to alter or modify the common law unless they *expressly* so provide." *Agassiz & Odessa Mut. Fire Ins. Co. v.*

*Magnusson,* 272 Minn. 156, 166, 136 N.W.2d 861, 868 (1965) (emphasis added); *see also Morris v. Am. Family Mut. Ins. Co.,* 386 N.W.2d 233, 237–38 (Minn.1986). Assuming that the class has stated a common law cause of action, the filed rate doctrine cannot be applied against them absent express legislative intent that insurance providers are immune from judicial oversight.

## II.

Compounding my concern that none of the filed rate doctrine rationales apply here are the severe consequences of applying the doctrine in this case. First, as the class argues, consumers are largely left without a remedy under the regulatory scheme. In this case, the DOC and State Farm privately agreed to a $75,000 "investigation fee" that went to the state. The DOC did not seek refunds of any of the nearly 20 million dollars in URP surcharges that class members paid to State Farm. The public had no input in this remedy and no opportunity to intervene. Because the DOC agreed to charge a violation of section 72A.20, subdivision 13(b), and State Farm agreed to stop charging the URP, the class could not appeal the consent order in any way. *See* Minn.Stat. §§ 72A.25, 72A.26 (2004). There are no remaining statutory provisions allowing for intervention, appeal, or judicial review. The class's only remedy—the remedy that the court now forecloses—was to file a lawsuit.

The second consequence of this decision is that the law regarding racial discrimination in insurance practices will now be determined by executive officials who are not bound by stare decisis and who, as history informs us, may well be complicit in the effort to discriminate. *See generally, e.g., Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (racial segregation by school officials); *Atwater v. City of Lago Vista,* 532 U.S. 318, 360, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (O'Connor, J., dissenting) (recognizing the problem of police using minor traffic infractions to engage in racial profiling). On July 23, 1997, the DOC determined that State Farm's URP was not racially discriminatory. In October of 2002, a different DOC official determined that the URP was racially discriminatory. On April 9, 2004, yet another DOC official determined that the URP was not racially discriminatory. The result of the court's decision is that the legal acceptance of racially discriminatory behavior will change with the changing tides of the DOC administration, or even with the different DOC officials assigned to review the behavior on a particular day. This does not comport with the rule of law.

Third, the passive nature of the DOC's review leaves me with serious concerns about the degree of attention that will be given to compliance with anti-discrimination statutes. There is no requirement that the DOC even review rates that are filed with it. And even if it does review all rates as a matter of course, the review serves four distinct functions and, as the court highlights, the insurance regulatory scheme is "very comprehensive." This means that the DOC is responsible for ensuring compliance with dozens of statutes before a problem or complaint with regard to one even arises. Finally, although an investigation was initiated here based on one customer's complaint after the URP was approved, there is nothing that requires the DOC to initiate such an investigation. While I do not endorse passive review as an exception to the filed rate doctrine, I know that passive review without judicial oversight may well result in no review of insurance rates.

For these reasons, I would reverse the district court's grant of summary judgment on the basis of the filed rate doctrine. While I agree in principle with the concept of the filed rate doctrine, I believe that the facts of this case undermine the rationales for adopting the filed rate doctrine here and results in severe and unfair consequences for insurance purchasers who are also persons of color. For purposes of compliance with anti-discrimination statutes, insurance companies, like all non-regulated industries, should be accountable to all three branches of government.