COMMONWEALTH of Kentucky, ex rel., Attorney General Albert B. CHANDLER III, Appellant,

v.

ANTHEM INSURANCE COMPANIES, INC., Southeastern Group, Inc., and Southeastern United Medigroup, Inc., Appellees.

No. 1998–CA–001016–MR.

Court of Appeals of Kentucky.

April 30, 1999.

Rehearing Denied July 9, 1999.

A.B. Chandler III, Attorney General, Scott White, Assistant Deputy Attorney General, Robert Bullock, Kirk Ogrosky, David S. Kaplan, Assistant Attorneys General, Frankfort, Kentucky, for Appellant.

K. Gregory Haynes, Frank F. Chuppe, Virginia H. Snell, Jean W. Bird, Wyatt, Tarrant & Combs, Louisville, Kentucky, for Appellee.

Before KNOPF, KNOX, and SCHRODER, Judges.

## OPINION

KNOPF, Judge.

The Commonwealth, through its Attorney General, appeals from an April 6, 1998, order of the Franklin Circuit Court summarily dismissing a portion of the Commonwealth's consumer protection action against the appellees, Anthem Insurance Companies, Inc.; Southeastern Group, Inc., d/b/a Anthem Health Plans; and Southeastern United Medigroup, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem" or "the insurers"). Among other allegations, the Attorney General complained that Anthem and its corporate family had engaged in a fraudulent scheme to charge Kentucky consumers of health insurance inflated premium rates. Anthem moved to dismiss the complaint pursuant to CR 12(2)(f). The trial court ruled, without opinion, that this allegation fails to state a cause of action under the Consumer Protection Act, KRS 367.110 *et seq.* For the following reasons, we affirm in part, reverse in part, and remand for additional proceedings.

The allegations in this case are strikingly similar to those advanced in *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17 (2 nd Cir.1994), which the trial court there summarized as follows:

> The complaints allege that NYTel [New York Telephone Company] and NETel [New England Telephone Company] gave regulatory agencies and consumers misleading financial information to support the inflated rates they requested. More particularly, plaintiffs allege a scheme in which certain unregulated subsidiaries of NYNEX [the corporate entities collectively along with subsidiaries and individual directors and officers] sold products and services to NYTel and NETel at inflated prices. NYTel and NETel then used those prices to justify inflated rates, resulting in high profits to the NYNEX corporate family, which profited by extracting higher rates from ratepayers, but did not suffer from the higher "cost" of products and services because these extra costs inured to the benefit of members of the corporate family. The net effect, the complaints allege, was that the ratepayers and the regulatory agencies were misled into believing that certain higher rates were justifiable, and the NYNEX corporate family was able to enjoy inflated profits as a result of its misrepresentations.

*Wegoland Ltd. v. NYNEX Corp., supra,* 27 F.3d at 18 (internal quotation marks omitted).

In this case, similarly, the Attorney General alleges that the 1993 merger of Anthem Insurance Companies, Inc., an Indiana-domiciled mutual insurance company, with Southeastern Mutual Insurance Company of Kentucky gave rise to a corporate family, Anthem, in part regulated, in part unregulated, like the NYNEX family in *Wegoland.* Much as was alleged in *Wegoland,* the Attorney General alleges that unregulated portions of the Anthem family charged portions regulated in Kentucky excessive fees for administrative and other services and that those excessive fees were then fraudulently passed on to Kentucky rate-payers. The excessive fees served not only to enhance the corporate family's overall profits, according to the Attorney General, but served as well to bolster the value of the unregulated portion of the family's stock, stock held primarily by Anthem. The Attorney General charges that Anthem obtained approval for the 1993 merger by misrepresenting the merger's purposes and potential benefits. The merger either advanced or made possible the scheme because, by giving rise to the corporate family, it provided the framework within which the scheme could operate. The Attorney General further charges that the insurance companies then carried out the scheme by basing fraudulent rate applications on the overstated intra-family service charges.

The trial court's order does not include the court's reasoning, but the appellees offer two (2) rationales for affirming the dis-

missal of the Attorney General's complaint. The so called "filed rate doctrine," they assert, renders any of their actions approved by the Insurance Commission (as were the merger and allegedly excessive rates) immune from suit under the Consumer Protection Act. Moreover, they insist, the dealings complained of by the Attorney General, the merger negotiations for example, are not cognizable under the Consumer Protection Act because they did not occur "in trade or commerce."

As the parties acknowledge, a dismissal pursuant to CR 12.02(f) for failure to state a claim is proper only if "it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Pari–Mutuel Clerks' Union v. Ky. Jockey Club,* Ky., 551 S.W.2d 801, 803 (1977) (citation omitted). In reviewing such a dismissal, this Court must presume that all the factual allegations in the complaint are true and must draw any reasonable inference in favor of the non-movant. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Feathers v. State Farm Fire & Cas. Co.,* Ky.App., 667 S.W.2d 693 (1983), *overruled on other grounds, Federal Kemper Ins. Co. v. Hornback,* Ky., 711 S.W.2d 844 (1986).

The insurance companies maintain that, even if the Attorney General's allegations are true, the "filed rate doctrine" shields them from liability. In general terms, the filed rate—or filed tariff—doctrine provides that tariffs duly adopted by a regulatory agency are not subject to collateral attack in court. This preclusion is said to ensure both that regulatory rates are non-discriminatory (rate-payers who bring suit will not obtain rates more favorable than those who do not), and that the agency's "primary jurisdiction" in the area of its expertise is upheld. *Wegoland Ltd. v. NYNEX Corp., supra.* The doctrine re-

ceived one of its earliest expressions in *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In that case, a Minnesota manufacturer and shipper sought damages from an association of railroads for having collusively set excessive shipping fees in violation of the antitrust laws. The Supreme Court ruled that, even if the alleged conspiracy could be proved, the shipper had no cause of action for damages because the Interstate Commerce Commission had approved the allegedly excessive rates and had determined them to be reasonable and non-discriminatory. To recognize the plaintiff's claim, Justice Brandeis explained, would require a court to second-guess the Commission and would thus tend to undermine the regulatory scheme adopted by Congress.

> The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

*Keogh v. Chicago & Northwestern Ry., supra,* at 163, 43 S.Ct. at 49, 67 L.Ed. 183. at (citation omitted). The purpose of the filed rate doctrine, in other words,

> is to preserve the authority of the legislatively created agency to set reasonable and uniform rates and to insure that those rates are enforced, thereby preventing price discrimination.

*Sun City Taxpayers' Association v. Citizens Utilities Company,* 847 F.Supp. 281, 288 (1994) (citations omitted).

The filed rate doctrine, therefore,

> prohibits a ratepayer from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue.

*Id.* at 288.

■ Since the rendition of *Keogh,* courts have repeatedly held, in a variety of regulatory contexts, "that a consumer's claim, however disguised, seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission, is viewed as an attack upon the rate approved by the regulatory commission. All such claims are barred by the 'filed rate doctrine.'" *Porr v. NYNEX Corporation,* 230 A.D.2d 564, 660 N.Y.S.2d 440, 442 (1997) (telephone regulations); *Minihane v. Weissman and Empire Blue Cross & Blue Shield,* 226 A.D.2d 152, 640 N.Y.S.2d 102 (1996) (health insurance regulations); *Town of Norwood v. New England Power Company,* 23 F.Supp.2d 109 (D.Mass.1998) (electric utility regulations). In recent years, the filed rate doctrine has been criticized as obsolete and as out of keeping with legislative attempts to imbue regulated industries with as much freedom for competition as possible, but the doctrine has survived these attacks.

In *Square D Co. v. Niagara Frontier Tariff Bur.,* for example, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court reaffirmed the doctrine against just such criticisms. As was the case in *Keogh, Square D* involved allegations by a shipper that it had been subjected to excessive and illegally obtained shipping rates. The shipper, seeking damages based on the alleged overcharges, urged that *Keogh* be overruled because the practical reasons advanced in that case for judicial abstention from rate review had lost much of their cogency. The Supreme Court, although apparently sympathetic to much of this criticism, held nevertheless that Congress's historical retention of the doctrine despite numerous opportunities to modify or overrule it had so established it within the economic fabric of the nation as to render judicial repeal inappropriate.

More recently, in *AT & T v. Central Office Telephone,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), the Court applied the filed rate doctrine to reverse an award of damages to a reseller of long-distance telephone service which had bargained for out-of-tariff consideration from AT & T and suffered injury to its business when AT & T later reneged on the bargain and insisted upon tariff rates and conditions. Less apologetic than it had been in *Square D,* the Court noted that the principle of non-discrimination lies at the heart of any tariff system. No matter how market-oriented the tariff system may be, the underlying principle of non-discrimination cannot be given effect without strict enforcement of filed rates, i.e. without the filed rate doctrine.

Although the filed rate doctrine originated in the federal courts, it "has been held to apply equally to rates filed with state agencies by every court to have considered the question." *Destec Energy, Inc. v. Southern California Gas Company,* 5 F.Supp.2d 433, 458 (S.D.Tex.1997) (citations omitted). In *N.C. Steel, Inc. v. National Council on Compensation Insurance,* 347 N.C. 627, 496 S.E.2d 369 (1998), North Carolina employers alleged that they had been charged excessive premiums for workers' compensation insurance as a result of the defendant insurance companies' withholding of evidence from the Insurance Commissioner. In adopting and applying the filed rate doctrine to bar the complaint, the Supreme Court of North Carolina reasoned that the comprehensive regulatory scheme for insurance companies evidenced the General Assembly's intent that duly established insurance rates not be subject to collateral attack by ratepayers.

■ We agree with the appellees that the filed rate doctrine, although not heretofore applied in Kentucky by name, has nevertheless been recognized in Kentucky in principle. *See Boone County Sand and Gravel Company, Inc. v. Owen County Rural Electric Cooperative Corporation,* Ky.App., 779 S.W.2d 224 (1989) (holding that the appellant was liable for undercharges based upon the filed rate despite the appellee's apparent negligence in not charging the correct amount); *see also Big*

*Rivers Electric Corporation v. Thorpe*, 921 F.Supp. 460, 464–65 (W.D.Ky.1996) (noting in the context of regulated utilities, that Kentucky's statutory and case law "clearly set[s] forth the underlying principles of the filed rate doctrine ...."). Indeed, we believe that the filed rate doctrine is but a special instance of the more general principle, observed in *American Beauty Homes Corporation v. Louisville and Jefferson County Planning and Zoning Commission*, Ky., 379 S.W.2d 450 (1964), that legislative functions are outside the scope of judicial power. Such legislative functions include both the zoning adjustment at issue in *American Beauty Homes* and the rate setting at issue here. This constitutional limitation renders moot, we think, the debate mentioned above as to whether the filed rate doctrine has lost its practical justification.

 The filed rate doctrine applies, furthermore, to the insurance practices involved in this case. KRS Subchapters 304.17 and 304.17A are detailed legislative attempts to regulate the health insurance industry in Kentucky. Both currently and at the time of the improprieties alleged by the Attorney General, health insurance premium rates were required to be filed with and approved by the Department of Insurance. KRS Subchapter 304.2 provides for that Department and entrusts to the Commissioner thereof supervision of its operations, including review, investigation, and approval or disapproval of premium rates. The legislative polices embodied in the insurance code and the administrative apparatus called into being to carry out those policies are sufficiently comprehensive to remove health insurance regulation from the common law in Kentucky and to invoke the filed rate doctrine. Accordingly, we agree with the appellees and the trial court that the Attorney General's suit for damages

must be dismissed. The claimed damages could only be calculated by determining the insurance rates which "should" have been adopted by the Commissioner. This is precisely the sort of inquiry courts are constitutionally unable to perform. Like the court in *Wegoland Ltd.*, moreover, we are persuaded that "there is no fraud exception to the filed rate doctrine that would save this [portion of the Attorney General's] suit from dismissal." *Wegoland Ltd. v. NYNEX Corp., supra*, 27 F.3d at 22.[1]

 This conclusion is not the end of the matter, however, for the Consumer Protection Act, upon which the Attorney General bases his claim, provides for remedies other than damages, such as injunctive relief (KRS 367.190) and civil penalties (KRS 367.990). These alternative remedies do not implicate the filed rate doctrine, which, contrary to the appellees' contentions, does not provide regulated entities with a general immunity from the laws governing business practice:

> [T]he filed rate doctrine does not leave regulated industries immune from suit under the RICO [Racketeering in Corrupt Organizations Act] or antitrust statutes. While individual ratepayers are precluded from challenging the reasonableness of the rates, the proper government officials remain free to pursue this avenue in appropriate circumstances.

*Wegoland Ltd. v. NYNEX Corp., supra*, 27 F.3d at 22 (citation omitted). The same point was discussed as follows in *Sun City Taxpayers' Association v. Citizens Utilities Company, supra*:

> As Justice Brandeis explained in *Keogh*, the filed rate doctrine bars a private party from bringing a civil action under the Antitrust Act, but it does not bar the Government from bringing an action against the defendant.... As a result,

---

1. We note that this ruling does not leave ratepayers without a remedy. Changes to the Insurance Code adopted in 1996 provide that the Insurance Commissioner may reconsider

approved premium rates at any time and order refunds of any premiums determined to have been excessive. KRS 304.17A.095.

the filed rate doctrine does not completely immunize utilities from the antitrust laws; they remain subject to actions brought by the Government for criminal sanctions and other equitable relief.... Similarly, the filed rate doctrine would not, as the plaintiff suggests, immunize utilities completely from RICO—they would remain subject to suits brought by the Government under RICO because the filed rate doctrine bars only a ratepayer's private civil RICO remedy.

■ If the Attorney General has stated a cause of action under the Consumer Protection Act, therefore, his claim is not barred even though the filed rate doctrine limits the potential remedies. Anthem contends, however, that the business conduct of which the Attorney General complains does not come within the Consumer Protection Act because it did not occur in the course of trade or commerce. It is that contention to which we now turn.

The heart of the Consumer Protection Act, KRS 367.170, **Unlawful acts**, provides as follows:

> (1) Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. (2) For the purposes of this section, unfair shall be construed to mean unconscionable.

Anthem focuses its attention on the portion of the Attorney General's complaint concerning Anthem's alleged misleading statements to shareholders and to the Insurance Commissioner as it sought approval for the merger with Southeastern Mutual Insurance Company. Because proxy solicitations and merger negotiations are not sales, rentals, or other distributions of services or property, the appel-

lees maintain, they do not fall within the purview of the Consumer Protection Act.

Whatever its merits as an abstract expression of law, the appellees' contention mischaracterizes the complaint. Recalling that at this stage of the proceeding we must accept the Attorney General's factual accusations as true and indulge him with the benefit of every reasonable legal doubt, we believe that the appellees' focus on the merger provides too narrow a view; when more fully considered, the complaint states a cause of action under KRS 367.170.

■ We note, initially, that our Supreme Court has construed the Consumer Protection Act broadly to effectuate its purpose of "curtail[ing] unfair, false, misleading or deceptive practices in the conduct of commerce...." *Commonwealth v. North American Van Lines, Inc.*, Ky.App., 600 S.W.2d 459, 462 (1979). The Court has recognized that the "conduct of commerce" can include wholesaler and producer transactions, *North American Van Lines, supra,* and that it can include retail practices other than those immediately involving sales or leases, provided that they bear directly and significantly on such ultimate dealings. *See Stevens v. Motorists Mutual Insurance Company,* Ky., 759 S.W.2d 819 (1988) (holding that the Consumer Protection Act provides a remedy against one's own insurer for deceptive claims settlement practices). The Attorney General has alleged deceptive acts by Anthem—false statements to the public, to shareholders, and to the Insurance Commissioner—which, allegedly, were intended to and did directly affect the price term of Anthem's retail insurance contracts; these acts, therefore, if proven, could bring Anthem within the scope of the Consumer Protection Act.[2] Our Supreme Court, fur-

---

**2.** The Attorney General's entitlement to a remedy would depend, of course, on his proving that these acts had caused or were likely to cause an injury. Because such proof is apt to require him to show that the approved premium rates were higher than they would have been absent the alleged wrong doing, it might seem that the filed rate doctrine should bar any relief, not just damages. Proving that the filed rate was affected by the alleged fraud, however, is not the same as proving what the rate should have been. The court is competent to determine whether Anthem engaged in wrongful acts and whether those

thermore, has previously deemed an insurance company's rate filings subject to the consumer protection provisions of the Insurance Code. *Morgan v. Blue Cross and Blue Shield of Kentucky, Inc.*, Ky., 794 S.W.2d 629 (1989). We fail to see why such rate filings would not then be subject to the provisions of the Consumer Protection Act.

█ This last point raises an important question related to the administrative law concerns discussed above. Why, it may be asked, should the Attorney General be allowed to resort to the Consumer Protection Act when he may well have an administrative remedy under the Insurance Code? Administrative remedies must usually be exhausted before recourse can be had in court, and injunctive relief is usually inappropriate if the petitioner has an alternative remedy. *Cf. State of Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (dissenting opinion by Justice Stone).

These considerations would very likely foil the remainder of the Attorney General's claim were it not for KRS 367.190. That statute, which underscores the Attorney General's authority to seek to enjoin unfair trade practices, provides in subpart (3) as follows:

> In order to obtain a temporary or permanent injunction, it shall not be necessary to allege or prove that an adequate remedy at law does not exist. Further, it shall not be necessary to allege or prove that irreparable injury, loss or damage will result if the injunctive relief is denied.

We regard this relaxation of the usual standards governing the availability of an injunction as a strong indication of the General Assembly's intent that the Consumer Protection Act, in the hands of the Attorney General, be a flexible and effective means of combating abusive trade practices however novel their forms or well disguised their sources. Denying the Attorney General an opportunity to develop the case he has alleged against Anthem would frustrate that intent.

█ In sum, although we agree with the trial court that the filed rate doctrine bars rate-payers (even under the auspices of the Attorney General) from seeking damages for approved but allegedly improper insurance rates, we do not agree that that doctrine or any other principle of administrative law shields the appellees from all liability under the Consumer Protection Act. The Attorney General's responsibility in his role as policeman of the marketplace authorizes him, when he deems it of sufficient importance to the public welfare, to seek injunctive relief against threatened unfair trade practices and civil penalties against such practices already committed. Because the allegations the Attorney General has raised against the appellees, could, if proven, amount to a violation (or violations) of the Consumer Protection Act, and because remedies other than damages are potentially available, the trial court erred by dismissing the Attorney General's complaint.

For these reasons, we affirm the April 6, 1998, order of Franklin Circuit Court to the extent that it dismissed the Attorney General's claim for damages, but otherwise we reverse that order and remand for further proceedings consistent with this opinion.

ALL CONCUR.

---

acts tainted the rate-making process. The filed rate doctrine (and separation of powers constraints) precludes only the court's being asked to redo the agency's legislative business and substituting its policy judgments for the agency's. *See American Telephone and Telegraph Company v. Central Office Telephone, Inc., supra,* (concurring opinion by Chief Justice Rehnquist).