RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GRANITE STATE INSURANCE COMPANY,

*Plaintiff-Appellee*,

*v.*

STAR MINE SERVICES, INC.,

*Defendant-Appellant*.

No. 21-5852

─────────────────

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:19-cv-00184—Joseph H. McKinley Jr., District Judge.

Decided and Filed:  March 15, 2022

Before:  COLE, CLAY, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Thomas E. Springer, III, Madisonville, Kentucky, for Appellant.  Michael C. Merrick, Burt A. Stinson, KAPLAN JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, for Appellee.

─────────────────

## OPINION

─────────────────

THAPAR, Circuit Judge.  When Star Mine Services refused to comply with its insurance company's annual audit, it ended up with a hefty charge on its final bill.  Now, Star Mine tells us that charge is an unenforceable penalty.  But because Kentucky's insurance regulator blessed the rates that Kentucky insurance companies charge, Star Mine's claim is barred from our review.  We affirm.

I.

Star Mine Services was a mine staffing company that bought a workers' compensation insurance policy from Granite State Insurance Company. Granite State billed the insurance in two installments, based on Star Mine's payroll figures. At the start of each policy year, Star Mine gave Granite State an estimate of its total payroll. Granite State used that figure to calculate an estimated premium—that is, an estimated total for what the insurance would cost at the end of the policy year—and Star Mine paid this preliminary charge. At the end of each year, Granite State audited Star Mine's records to produce an exact payroll number for the full year. It then charged Star Mine additional premiums—or reconciliation payments—for any payroll above the preliminary charge. So if a year's estimated premium were perfectly accurate, Star Mine wouldn't owe anything at the end of the year.

The companies followed this pattern for several years. And 2018 began the same way. Star Mine gave a payroll estimate, Granite State billed the company for its estimated premium, and Star Mine paid the bill. But then Granite State completed its year-end audit for the prior year. That audit revealed that Star Mine had significantly underestimated its 2017 payroll—just as it had done for 2016. To avoid a similar situation with the 2018 policy, Granite State adjusted its estimated premium for Star Mine halfway through the year. In accordance with industry guidelines, the insurer upped Star Mine's 2018 estimated premium to reflect 2017's actual payroll numbers. And it gave Star Mine four weeks to pay the difference. But Star Mine never paid up. So Granite State canceled the policy about three months early. And without insurance, Star Mine had to close its business.

To determine Star Mine's final premium—and whether it owed a reconciliation payment—Granite State needed to complete its year-end audit of Star Mine's 2018 payroll records. But Star Mine wouldn't comply. Despite Granite State's repeated attempts—and warnings that more charges for noncompliance would follow—Star Mine never sent all the requested information for the audit. Nor did Star Mine ever pay the updated premium.

Granite State sent one final bill. The bill outlined Star Mine's outstanding charges, including the updated estimated premium for 2018 (prorated to account for the policy's early

cancellation).  The last bill was $1,485,323, which included an "audit noncompliance charge" (double 2018's total estimated premium).  Star Mine never responded, and Granite State sued for breach of contract.

The parties filed cross-motions for summary judgment.  The district court entered summary judgment for Granite State, and Star Mine appealed.

## II.

We review the district court's grant of summary judgment de novo.  *Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013).  Because Granite State's breach of contract claim is based on Kentucky law, we apply the law as Kentucky courts would.  *See State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017).  Here, the district court granted summary judgment for Granite State on two issues:  (1) whether the filed-rate doctrine bars our review of the audit noncompliance charge's enforceability; and (2) the amount of damages.  Star Mine contests both conclusions.

## A.

Start with the audit noncompliance charge.  The charge, which is part of both the parties' insurance policy and an industry manual filed with state regulators,[1] allows Granite State to charge Star Mine twice its estimated annual premium if it doesn't comply with the year-end audit.  Star Mine claims that the charge is an unenforceable penalty.  But the district court found that the filed-rate doctrine bars judicial review of the claim.[2]  The district court is correct:  We can't review the merits of Star Mine's challenge.

The filed-rate doctrine "provides that tariffs duly adopted by a regulatory agency are not subject to collateral attack in court."  *Commonwealth ex rel. Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48, 51 (Ky. Ct. App. 1999).  It also protects the agency's jurisdiction over approval

---

[1]The parties don't contest the district court's finding that the audit noncompliance charge was filed with the state agency.

[2]Star Mine makes a halfhearted argument that Granite State forfeited the filed-rate-doctrine defense because it raised the issue only in its response brief.  But Star Mine had a chance to respond to that issue below, and it did not ask the district court to consider it forfeited.  It cannot do so now.  *See Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012).

processes, limiting court intervention as soon as the agency receives a rate. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012). Simply put, this means that if a company—like Granite State—files its rates with a government agency, customers can't then argue in court that those rates are unreasonable.

Kentucky roots the doctrine in two rationales. First, it respects the separation of powers. When the legislature has authorized an agency to set (or approve) rates in an industry, the doctrine keeps judges from second-guessing the agency's judgment as to a rate's reasonableness. And second, it ensures that "regulatory rates are non-discriminatory," since customers who sue won't be able to secure lower rates than those who don't. *See Anthem*, 8 S.W.3d at 51.

The parties agree that the filed-rate doctrine applies to the workers' compensation insurance industry, which is heavily regulated under state law. *See* Ky. Rev. Stat. § 304.13-011 *et seq.* But the parties disagree on whether the doctrine applies to Star Mine's challenge here. Star Mine suggests it doesn't apply for two reasons: (1) the audit noncompliance charge doesn't constitute a "filed rate"; and (2) Star Mine is challenging only the charge's enforceability, not its reasonableness. Neither argument has merit.

1.

What counts as a filed rate? The filed-rate doctrine began in federal courts, which applied the doctrine to rates filed with federal agencies. *See, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577–78 (1981); *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520–21 (1939); *Keogh v. Chi. & Nw. Ry. Co.*, 260 U.S. 156, 163–64 (1922). And state courts, including Kentucky's, adopted it to bar review of rates filed with state agencies. *See Anthem*, 8 S.W.3d at 51; *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994); *see also, e.g.*, *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 314–17 (Minn. 2006).

Given this backdrop, we look to both state and federal caselaw for guidance.[3] Starting with Kentucky caselaw, the filed-rate doctrine encompasses both "tariffs" and "rates." *Anthem*,

---

[3]Star Mine contends that Kentucky has adopted only a "limited" filed-rate doctrine that doesn't mirror the federal doctrine. Appellant's Br. 15. It reasons from the most prominent Kentucky case on the issue: *Commonwealth ex rel. Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48 (Ky. Ct. App. 1999). But Star Mine fails to explain how *Anthem*'s reasoning differs in any meaningful way from federal caselaw. The most it does is claim the

8 S.W.3d at 51–52.  Courts must strictly enforce both when they've been filed with the Commissioner of Insurance.  *Id.*  Though we do not parse judicial opinions as we do statutes, we must ask what the state court meant by "tariffs" and "rates."  The terms' definitions are helpful starting points.  A tariff, in this context, may be defined as "any list or scale of prices, charges, etc."  *Tariff*, *Webster's New World College Dictionary* (3d ed. 1996).  And a rate means "a price or value; specif[ically] the cost per unit of some commodity, service, etc."  *Rate*, *Webster's New World College Dictionary* (3d ed. 1996).[4]  (In this context, that unit of service might be hours of payroll.)

*Anthem* isn't the only case to sweep both tariffs and rates within the scope of the doctrine: Several others have as well.  *See, e.g.*, *Keogh*, 260 U.S. at 163; *Williams*, 681 F.3d at 796; *MCI Telecomm. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547 (6th Cir. 2004).  So we see no reason to exclude from the doctrine charges that are untethered from a cost-per-unit calculation but are still part of a pricing scheme.

The Supreme Court also takes a broad approach to what counts as a "filed rate."  Applying the filed-rate doctrine, the Court explained that "[r]ates . . . do not exist in isolation."  *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 223 (1998).  Instead, rates "have meaning only when one knows the services to which they are attached."  *Id.*  Simply put, the price you're paying is inextricable from what you're getting.  So the filed-rate doctrine covers not just a contract's price term, but also the terms of service.  Indeed, using this broad understanding, the Court barred the entire filed tariff in that case from judicial review, including all charges and "classifications, practices, and regulations affecting such charges" (that is, terms of service).  *Id.* (quoting 47 U.S.C. § 203(a)).

---

case limits Kentucky's filed-rate doctrine to bar only claims that would make courts "second-guess" the Commissioner of Insurance's approvals.  But even if that's true, Star Mine offers no reason that purported distinction is relevant here.  Thus, we rely on both Kentucky and federal caselaw.

[4]Legal usage tracks the ordinary meaning of both terms.  *Black's Law Dictionary* defines tariff, in this context, as "[a] public document setting forth services of common carrier being offered, rates and charges with respect to services and governing rules, regulations, and practices relating to those services."  *Tariff*, *Black's Law Dictionary* (6th ed. 1990).  And it defines "rate" in connection with public utilities as "a charge to the public for a service open to all and upon the same terms . . . generally means price stated or fixed for some commodity or service of general need or utility supplied to the public measured by specific unit or standard."  *Rate*, *Black's Law Dictionary* (6th ed. 1990).

The Supreme Court's broad understanding of "filed rates" guides the analysis here and shows that the audit noncompliance charge is barred from our review. The charge is included in both the policy's list of charges and the industry manual filed with the state agency. It promotes compliance with the contract's audit requirement, and it allows Granite State to make up its losses if Star Mine refuses an audit that would have resulted in a higher premium. The charge is one of many components of the regulatory and contractual scheme. *Cf. id.* at 225. All this suggests the audit noncompliance charge is part of an insurance-industry "tariff"—a list of services, rates, and charges—and falls within the filed-rate doctrine's protection.

What's more, even a narrower reading of "rate" or "tariff" could include the audit noncompliance charge. The policy itself connects the charge to the final premium for audit-noncompliant companies. It provides that if Star Mine is found noncompliant and billed for the charge, but later provides audit materials, Granite State "will revise [the] premium" and remove the charge from the amount due. R. 53-1, Pg. ID 498; *see id.* at 531–33. And the industry manual clarifies that though the charge "is not part of standard premium," it "is a premium charge" that is calculated using "the applicable state premium algorithm" when a company refuses an audit. *Id.* at 532. So rather than being completely untethered from Granite State's rates for service, as Star Mine contends, the audit noncompliance charge is closely tied to premium rates. Indeed, it's calculated as a multiplier of the estimated premium. And it effectively serves as a stand-in for the year-end reconciliation payment.

Star Mine nonetheless argues that because Granite State had discretion to apply the audit noncompliance charge, it cannot constitute a filed tariff. The crux of its argument is based on the nondiscrimination principle. Enforcing a set schedule of rates, as the filed-rate doctrine promises, makes certain that insured companies are all treated alike under the regulatory scheme. *See Williams*, 681 F.3d at 796. But here, Granite State can choose not just whether to apply the charge to an audit-noncompliant company, but also how much the charge will be. The contract establishes only a maximum multiplier (twice the estimated annual premium); it does not require that Granite State charge that maximum.

True, Granite State's discretion to apply the audit noncompliance charge means it has some room to discriminate among its customers. But that discretion is limited because the

charge is filed.  Though Granite State may choose not to apply the charge, it also may not charge anything beyond the fixed cap of twice the estimated annual premium.  So strictly enforcing the charge's terms does keep insurers like Granite State from charging more—perhaps three or four times the premium—for companies the insurers fear won't comply with an audit.

And because the audit noncompliance charge is filed with the Commissioner of Insurance, finding it within the scope of the filed-rate doctrine is faithful to the doctrine's other rationale:  the separation of powers.  The Kentucky Court of Appeals emphasized that it adopted the doctrine to keep "legislative functions . . . outside the scope of judicial power."  *Anthem*, 8 S.W.3d at 53.  Here, the audit noncompliance charge was put before the Commissioner of Insurance for approval.  From there, it's in the agency's hands—and it's not our role to second-guess the agency's determination.

3.

Star Mine next argues that even if the charge does count as a "rate" under the filed-rate doctrine, our review is appropriate because it challenges the enforceability (*i.e.*, legality) of the charge—not its reasonableness.  *See Williams*, 681 F.3d at 796 (allowing claims that involve discussion of rates but do not challenge their reasonableness).  While a clever point, this doesn't do the trick.

First, the Kentucky Supreme Court has rejected Star Mine's distinction.  Though deciding the case on different grounds, that court suggested that the filed-rate doctrine could bar a challenge that "directly attacks the legality" of an approved rate.  *S. Fin. Life Ins. Co. v. Combs*, No. 2010-SC-000244-MR, 2010 WL 3722869, at *5 (Ky. Sept. 23, 2010).  Thus, distinguishing between legality and reasonableness does little to help Star Mine.

But even setting this aside, the argument cannot stand.  Say we take Star Mine at its word.  Its challenge involves not the reasonableness of the audit noncompliance charge, but whether state law permits it at all.  State contract law allows liquidated damages, but not penalties.  *See Patel v. Tuttle Props., LLC*, 392 S.W.3d 384, 387 (Ky. 2013).  So we would ask whether the audit noncompliance charge is a liquidated-damages provision or a penalty.  The distinction between the two?  Reasonableness.  Liquidated damages are permitted, "but only at

an amount that is reasonable" given the circumstances. *Mattingly Bridge Co. v. Holloway & Son Constr. Co.*, 694 S.W.2d 702, 705 (Ky. 1985) (quoting Restatement (Second) of Contracts § 356(1) (Am. L. Inst. 1981)). If a liquidated-damages provision crosses the line and becomes "unreasonably large," it's considered an unenforceable penalty. *Id.*

So if we followed Star Mine's lead, we'd end up just where we started—assessing the reasonableness of the audit noncompliance charge. And given our circumscribed role when it comes to filed rates, that is something we cannot do.

B.

Star Mine also has two objections to the district court's assessment of damages. First, it argues that it submitted affidavits contesting Granite State's calculation, thus creating a "genuine dispute [of] material fact." Fed. R. Civ. P. 56. And second, it claims the issue should go to a jury since Granite State reduced its calculation just before the entry of judgment.

Start with the first argument. Star Mine introduced affidavits attesting to some (though not all) aspects of the company's actual payroll for 2018. But those affidavits could only create a genuine issue of material fact if 2018's numbers were material. And they're not. After all, Star Mine failed to provide key audit information for 2018. So the district court calculated damages using the company's 2017 numbers. Star Mine doesn't argue the district court was wrong to use those numbers. Nor does it offer an alternative method of calculating damages. Thus, the affidavits are of no use, and the district court properly discounted them.

That brings us to Star Mine's next argument: that Granite State's last-minute adjustment to its calculation suggests its numbers are not sound. Granite State adjusted its calculation just before entry of judgment, reducing the amount due by $118,945. And it explained that the adjustment was necessary because it discovered that it had not applied a revision to Star Mine's "experience mod."[5] R. 60, Pg. ID 740.

---

[5] An "experience mod" accounts for a particular insured's loss history in rate calculations. *See* R. 60, Pg. ID 740. So if, for example, a company's employees had a track record of fewer workers' compensation claims than the average, the experience mod would reduce that company's premium charges. That was the case here.

The district court concluded that this revision was irrelevant to the issues in this case. And though Star Mine argued below that the presence of one error means "additional errors in their calculations are likely," it has not named any of these "likely" errors on appeal. R. 61, Pg. ID 769. Without a specific objection to Granite State's calculation, Star Mine offers no genuine dispute of material fact. Fed. R. Civ. P. 56(c).

\*          \*          \*

The judicial role is limited when legislatures vest agencies with the authority to approve rates. That's true in the insurance industry, and it's true of this policy's audit noncompliance charge. So the filed-rate doctrine bars Star Mine's challenge. And Star Mine points to nothing that disputes the damages amount. We affirm.