RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BRANDENBURG TELEPHONE COMPANY,

>  *Plaintiff-Appellant*,

*v.*

SPRINT COMMUNICATIONS COMPANY L.P.,

>  *Defendant-Appellee*.

No. 23-5369

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:09-cv-00109—Claria Horn Boom, District Judge.

Decided and Filed:  January 10, 2024

Before:  SUTTON, Chief Judge; STRANCH and MATHIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Edward T. Depp, DINSMORE & SHOHL, Louisville, Kentucky, for Appellant.
Philip D. Williamson, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for
Appellee.  **ON BRIEF:**  Edward T. Depp, John E. Selent, R. Brooks Herrick, Anne Stewart
Myers, DINSMORE & SHOHL, Louisville, Kentucky, for Appellant.  Philip D. Williamson,
Annie M. McClellan, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, Philip R.
Schenkenberg, TAFT STETTINIUS & HOLLISTER LLP, Minneapolis, Minnesota, for
Appellee.

_____

## OPINION

_____

SUTTON, Chief Judge.  After more than a decade of regulatory and judicial proceedings,
Sprint Communications concedes that it failed to pay Brandenburg Telephone Company in full
for connecting local telephone calls and now owes $2.2 million plus compound interest.  This
appeal concerns one residual question:  the interest rate on the award.  Sprint says that

Brandenburg's filed utility tariff sets the interest rate at 8%, and that Sprint is on the hook for $4.3 million in interest. Brandenburg replies that the tariff imposes a rate of 10.66%, bringing Sprint's bill to $7.1 million in interest. The district court ruled for Sprint. We affirm.

I.

Brandenburg provides local telephone services in central Kentucky. In view of the monopolistic nature of this utility service, it is heavily regulated. State and federal law require Brandenburg to obtain regulatory approval for the terms and conditions of its services. Once a regulator approves the filed tariff, anyone who uses the service must abide by the rates. *See generally Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 221–23 (1998). Brandenburg has one tariff with the Kentucky Public Service Commission for calls that begin and end in Kentucky and another with the Federal Communications Commission for interstate calls.

Among other services, the tariffs cover switched access services, which allow long-distance providers such as Sprint to connect calls to local numbers. At the time relevant to this appeal, the Kentucky tariff set a higher charge for this service than the federal tariff did. Brandenburg determined which calls were intrastate by comparing their area codes. That approach may have worked in the past. But Sprint claimed that the approach inflated the intrastate rates because cellphones use the same area code no matter where the call originates. When Brandenburg declined to change its billing method to account for this possibility, Sprint began withholding payments in late 2007 and complained to the Kentucky Public Service Commission about the overcharge. Brandenburg responded by suing Sprint in Kentucky state court. Sprint removed the case to federal court, which stayed the case until the parties exhausted their appeals of the state regulator's order.

The Kentucky Public Service Commission sided with Sprint. It ruled that Brandenburg's tariff required it to account for the geographic jurisdiction of wireless calls, not merely the area code. It stayed the order for thirty days to allow the parties to decide what Brandenburg owed Sprint and to otherwise resolve the matter. No consensual resolution occurred. Brandenburg instead appealed the Commission's order to state court. Almost a decade later, the Kentucky Court of Appeals ruled for Brandenburg, in part. It held that the local telephone company must

account for the geographic source of calls in the future. *Sprint Commc'ns Co. v. Brandenburg Tel. Co.*, No. 2017-CA-00534-MR, 2019 WL 4565546, at *1, *5 (Ky. Ct. App. Sept. 20, 2019). But it held that Brandenburg had no obligation to make retroactive changes to that calculation. *Id.*

With the state court proceedings over, the parties returned to federal district court. It concluded that Sprint breached Brandenburg's state tariff and awarded Brandenburg $2.2 million in principal—the amount Sprint withheld between November 2007 and February 2011. Brandenburg asked for prejudgment interest as provided in the section of its tariff that governs the penalty when a customer fails to pay on time. The provision says that Brandenburg may charge a "late payment penalty" that is the "lesser of" two alternatives. R.100-1 at 37. It may charge "the highest interest rate (in decimal value) which may be levied by law for commercial transactions, compounded daily for the number of days from the payment date to and including the date that the customer actually makes the payment to [Brandenburg]." *Id.* Or it may charge a standard rate of ".000292 per day," *id.*, which works out to an annualized rate of 10.66%. The district court used the 8% rate, and the court awarded Brandenburg an additional $4.3 million in prejudgment interest. Brandenburg appealed, claiming that the higher interest rate should apply.

II.

All that remains for resolution in this 16-year dispute is the proper interest rate to apply to the unpaid principal of $2.2 million. Recall that the tariff permits a "late payment penalty" that is the "lesser of" two alternatives: (1) "the highest interest rate (in decimal value) which may be levied by law for commercial transactions, compounded daily for the number of days from the payment date to and including the date that the customer actually makes the payment," or (2) a rate of ".000292 per day." *Id.* As to the first option, Kentucky's usury statute has set the default "legal rate of interest" for commercial transactions at 8% unless "any party or parties" agree otherwise when the original principal exceeds $15,000. Ky. Rev. Stat. § 360.010(1). As to the second option, the parties agree that it sets a 10.66% interest rate. Our task is to determine which of these rates—8% or 10.66%—applies.

As we see it, the 8% rate set by the Kentucky usury statute applies. Start with the tariff's choice of words. Its first prong sets the government rate as the highest "levied by law." R. 100-1 at 37. To "levy" an amount is to "impose or assess (a fine or a tax) by legal authority." *Levy*, *Black's Law Dictionary* 1091 (11th ed. 2019). When the government levies a sum "by" law, it means that the amount can be imposed or collected "by legal sanction," as opposed to levying "on" some person or asset. Bryan A. Garner, *Garner's Dictionary of Legal Usage* 540 (3d ed. 2011) (defining "levy"). The default rate that Kentucky permits to be collected by law is 8%. Ky. Rev. Stat. § 360.010(1).

The next phrase of the tariff—levied by law "for commercial transactions"—points in the same direction. R.100-1 at 37. The applicable rate is one that could apply in commercial transactions, plural, as opposed to a rate geared to a specific agreement in a particular commercial transaction, singular. By law, Kentucky set 8% as the "default statutory interest rate in the absence of a contractual rate between the parties," meaning the amount could be charged in multiple transactions without regard to any agreement in a single transaction. *Unifund CCR Partners v. Harrell*, 509 S.W.3d 25, 30 (Ky. 2017). Utilities, notably, have sought this same interest rate in other disputes under Kentucky law. *See, e.g.*, *In re Ky. Cable Telecomms. Ass'n*, No. 2003-00056, 2003 WL 21000967 (Ky. Pub. Serv. Comm'n Feb. 24, 2003).

Buttressing this reading is the reality that Kentucky long ago concluded that only the government may determine rates levied by law. In *Garrett v. Creekmore*, 89 S.W. 166 (Ky. 1905), Creekmore sold land to Garrett, who agreed to pay the property taxes on it even though Creekmore owned the land on the day of record. *Id.* at 167. Garrett later objected to paying the tax "on the ground that taxes must be levied by law, and may not be levied by agreement of parties." *Id.* at 168. Kentucky agreed with that "general principle" and observed that "[t]he tax was levied by the general law" on the property, regardless of who owned it. *Id.* But Garrett had separately agreed to cover Creekmore's liability and still had to pay that sum under their contract. *Id.* The same reasoning applies here. Even if the tariff could determine a "levy by agreement" between Sprint and Brandenburg, its express reference to the rate "levied by law for commercial transactions" shows that it adopts the legislature's choice of a generally applicable 8%. *Cf. In re Elec. Martin Cnty. Water Dist. Mgmt. & Operation Monitoring Pursuant to KRS*

*287.250*, No. 2020-00154, 2020 WL 4275012, at *2 n.8 (Ky. Pub. Serv. Comm'n July 22, 2020) (observing that the Kentucky statute "establishes a legal interest rate of 8% but permits parties to agree in writing to a higher interest rate" in evaluating utility's hardware accounts external to any relevant tariff).

This conclusion makes sense in the heavily regulated context of filed tariffs. *See MCI Telecomms. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547–48 (6th Cir. 2004). Unlike contracts that parties freely negotiate, tariffs represent the judgment of regulators about what rates and conditions will prove reasonable and uniform for utility customers. *See MCI Telecomms. Corp. v. Graham*, 7 F.3d 477, 479 (6th Cir. 1993); *Commonwealth ex rel. Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48, 51 (Ky. Ct. App. 1999). Once regulators approve a tariff, the filed-rate doctrine deprives utilities and their customers of the ability to contract around its terms. *See Chandler*, 8 S.W.3d at 51. This tariff's reference to the maximum levied by the General Assembly for general commercial transactions aligns with this reality of the filed-rate doctrine. Kentucky's default rule of an 8% interest rate in commercial transactions respects these considerations.

Brandenburg resists this conclusion. Noting that the Kentucky usury statute permits private parties to agree to higher interest rates, it claims that that is all the parties did here. Because the tariff provides the option of a 10.66% interest rate, and because the filed-rate doctrine required Sprint to agree to follow the tariff in return for using Brandenburg's services, Brandenburg reasons that the maximum rate levied by law in this transaction equals 10.66%. Kentucky, it is true, has sometimes described tariffs as agreements, at least in a colloquial sense. *See Royal Consumer Prods., LLC v. Saia Motor Freight Line, Inc.*, 520 S.W.3d 753, 758 (Ky. Ct. App. 2016); *but see Louisville & Nashville R.R. Co. v. Coquillard Wagon Works' Assignees*, 144 S.W. 1080, 1082 (Ky. 1912) (distinguishing regulator-approved tariffs from contractual agreements between a utility and its customers). Kentucky courts, it is also true, have said that a private agreement may "lev[y]" some rate or charge. *See Ky. State Univ. v. Ky. Dep't for the Blind*, 923 S.W.2d 296, 297 (Ky. Ct. App. 1996).

But these observations show only that *regulators* could approve a tariff with an interest rate above 8%. They do not establish that Brandenburg's present tariff imposes a 10.66%

interest rate on Sprint or other customers who fail to pay their bills on time. Even if a regulator-enforced tariff could be said to levy payment by law, *see Graham*, 7 F.3d at 479, that levy applies to the interactions between a utility and its customers. Brandenburg's tariff, in contrast, requires us to apply the maximum rate that may be levied by law for commercial transactions. The filed-rate doctrine does not permit us to look to the exclusive terms of Brandenburg's tariff to determine what rate applies to the general range of dealings between contractual parties.

Brandenburg worries that our interpretation reads the 10.66% rate out of the tariff. The highest rate that Kentucky permits to be levied by law is less than 10.66%, it claims, making the applicable interest rate in Kentucky invariably 8%. But nothing prevents Kentucky from raising the default rate of interest above 10.66% in the future. *See* 2017 Ky. Acts 103 (modifying default judgment interest rates). At that point, the tariff would assign the "lesser" of the rates, and it would be the 10.66% rate. Keep in mind that it was Brandenburg that filed the tariff, and at the time the default rate was 8%. This tariff language also accounts for its use in other States. Brandenburg's tariff follows the standard model of the National Exchange Carrier Association, and telephone companies have filed identical tariffs in ten other States. A company that filed this tariff in, say, Iowa would presumably collect only a 5% penalty rate, the highest default rate that Iowa establishes in most circumstances. *See* Iowa Code § 535.2(1). But a company that filed in South Dakota may be able to charge interest at the tariff's 10.66% standard rate because that State has established official interest rates as high as 15%. S.D. Codified Laws § 54–3–16.

At least one district court in another jurisdiction, we appreciate, has adopted Brandenburg's position and applied the 10.66% rate under this model tariff. *AT&T Corp. v. Beehive Tel. Co.*, No. 2:08CV941, 2010 WL 376668, at *7–8, 24 (D. Utah Jan. 26, 2010); *see also Peerless Network, Inc. v. MCI Commc'ns Servs., Inc.*, No. 14 C 7417, 2018 WL 3608559, at *4 (N.D. Ill. July 27, 2018) (stating in a challenge about compounded interest that the federal tariff's lesser rate was "1.5% per month" and not "the highest interest rate which may be applied under state law for commercial transactions" (emphasis omitted)), *rev'd in part, vacated in part on other grounds*, 917 F.3d 538 (7th Cir. 2019). But that court did not provide any reasoning why it chose this rate, what it equaled, or how it compared to the default state-law rate. The district courts that looked at all of these considerations have, consistent with our approach,

applied the default government rate of interest. *See S. New Eng. Tel. Co. v. Glob. Naps, Inc.*, No. 3:04-cv-2075, 2008 WL 534745, at \*4–5 & n.6 (D. Conn. Feb. 25, 2008); *MCI Worldcom, Inc. v. Tele Tower, Inc.*, No. 01 CIV. 0255, 2002 WL 378424, at \*1 (S.D.N.Y. Mar. 11, 2002).

Brandenburg argues that we must hold Sprint to two previous admissions in favor of the 10.66% rate. The first of these statements followed the Kentucky Public Service Commission's decision on Brandenburg's billing practices. After siding with Sprint, the Commission stayed its order for thirty days to permit Brandenburg and Sprint to reach an agreement about how much Brandenburg owed. Brandenburg also could have used that time to request an audit under another tariff provision, or it could have appealed the order straightaway. Sprint opened negotiations by asking for damages calculated under the 10.66% rate. Brandenburg never responded to that settlement offer in one way or the other. The second statement occurred in the district court. After Brandenburg asked for summary judgment on Sprint's liability, Sprint submitted an affidavit from the employee who had calculated Brandenburg's bill as part of the earlier negotiations. She explained that Sprint had "added interest in accordance with Brandenburg's intrastate access tariff" when crafting that settlement offer and provided no further detail about the interest rate. R.38-2 at 3.

These statements do not affect today's legal interpretation of the tariff or of state law. As a threshold matter, the filed-rate doctrine likely would not permit us to accept an admission contrary to the terms of the tariff. A central point of the doctrine is that the filed tariff must govern all transactions between a regulated utility and its customers. *Am. Tel. & Tel.*, 524 U.S. at 222–23. Only regulators may approve changes to those terms, and the utility and individual customers lack authority to bargain around the tariff, which as noted limited late-payment liability to 8%.

We decline at any rate to bind Sprint to these statements. For one, we usually do not take account of statements made during settlement negotiations when determining liability. *See* Fed R. Civ. P. 68(b); Fed. R. Evid. 408(a). Just as parties would not engage in frank settlement discussions if any statement they made behind closed doors could be used against them in court, so too would they limit themselves if they thought summaries of their bargaining positions could be used for the same purpose. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 798–

99 (6th Cir. 2007). True, neither the Commission nor Sprint used the word "settlement," but an effort to reach mutual agreement—a "resolution" of the dispute in the words of the Commission—about what Brandenburg owed Sprint and to end the litigation fits that meaning in every functional way. *See Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 493, 495 (6th Cir. 2020) (observing that settlement offers often read as demands styled in "loose rhetorical flair").

Nor do these statements even strike us as admissions. Judicial admissions must be "deliberate, clear and unambiguous." *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) (quotation omitted). Sprint did not make any formal stipulations or admissions in court when it sent its letter to Brandenburg. *See Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) (observing that not every statement made in court filings necessarily counts as an admission); *see also Borror*, 979 F.3d at 495 (expressing reluctance to bind parties to pre-litigation positions). And the affidavit that Sprint filed with the district court explained only that Sprint added interest to the bill without making unambiguous statements about what that rate equaled or how Sprint determined it. At any rate, Brandenburg refused to accept Sprint's settlement proposal, putting it in the same "admission" bind it thrusts on Sprint.

We affirm.